STATE OF NORTH DAKOTA, Respondent, v. HENRY LAYER, Appellant.

(184 N. W. 666.)

**Criminal law — defendant convicted of murder on his plea of guilty.**

1. The defendant was arrested and duly charged by a written information filed in the District Court of McLean county, North Dakota, with the commission of the crime of murder in the first degree. After his arrest, and before the filing of the information, he made a written confession of guilt, admitting therein that he killed Jacob Wolff, with whose murder he was charged by the information, and further admitting that he also killed Jacob Wolff's five children and Jacob Hofer, the hired chore boy. He states that Mrs. Wolff was killed by the discharge of a certain shot gun when he was endeavoring to take the same away from Jacob Wolff. After the entry of his plea of guilty, the Court made and entered a judgment of conviction, and thereafter sentenced defendant to the state penitentiary at Bismarck, North Dakota, for the term of his natural life.

**Criminal law — defendant convicted of murder on plea of guilty moved for new trial.**

2. Thereafter defendant made a motion for a new trial and appealed from the judgment of conviction. The basis of the motion was that the

written confession was procured from him by duress, coercion, intimidation, and fear, and that his plea of guilty was likewise procured, and that neither was voluntary.

**Criminal law — evidence held to show no duress or coercion in procuring confession or plea of guilty.**

3. An examination of the record. discloses that no duress, coercion, or intimidation was exercised in procuring the confession, nor was such used towards him to procure his plea of guilty to the crime charged in the information and for these and other reasons stated in the opinion, it is *held* that the Court did not err in denying defendant's motion for a new trial.

Opinion filed October 6, 1921.

Appeal from an order of District Court, McLean county, denying a new trial and from a judgment of conviction. *Nuessle, J.*

Affirmed.

*Edward P. Kelly* and *James Morris,* for appellant.

Where the accused in a criminal prosecution in the trial court is forced through well grounded fears of mob violence, to plead guilty and to be sentenced to imprisonment for a term of years, he has a right to relief from such sentence and plea by proper proceedings in the same Court. State v. Calhoun, 50 Kans. 532; 18 L. R. A. (N. S.) 838; 34 Am. St. Rep. 141.

The plea should be entirely voluntary by one competent to know the consequences and should not be induced by fraud, fear, pursuasion, promises, inadvertance or ignorance. Pope v. State 56 Fla. 81; 47 So. 487.

When the Commonwealth introduces in evidence a plea of guilty entered in the Justice Court, the defendant may show that such plea was obtained by duress. Holtman v. Commonwealth, 129 Kans. 710; 112 S. W. 851; Little v. Commonwealth, (Ky.) 34 L. R. A. (N. S.) 257.

A defendant has a right of relief from a judgment entered upon his plea of guilty, where such plea was forced from his reluctant counsel by threats of an angry and excited mob, and interposed because they believed that to proceed with the trial upon the plea of not guilty would result in the handling of their client by lawless men and was entered at a time when the defendant was lost and bewildered. Sanders v. State 85

Ind. 318; 44 Am. Rep. 29; 34 L. R. A. 257; Salina v. Cooper, 45 Kan. 12; 25 Pac. 233.

*Wm. Lemke,* Atty. General, *M. Tollefson,* and *John E. Williams,* for respondent.

GRACE, C. J. This is an appeal from a judgment of conviction and from an order of the district court wherein it denied the motion of the defendant to withdraw his plea of guilty, entered by him to the charge of murder in the first degree, contained in the information duly filed in the district court of McLean county. Subsequent to the time defendant entered his plea, the judgment of conviction was entered, and thereafter he was sentenced to imprisonment in the State Penitentiary at Bismarck for life.

Thereafter he made a motion before the same district judge, asking that the judgment of conviction be set aside, that his plea of guilty therefore entered be withdrawn, and in lieu thereof he be permitted to enter a plea of not guilty, and to have a trial upon the merits. The motion was heard before the court in the city of Bismarck, N. D., on November 27, A. D. 1920, and on the 28th day of January, 1921, court made an order denying in all things the motion. This order was filed in the office of the clerk of court of McLean county, N. D. From this order and the judgment, defendant appeals.

A statement of the material facts is substantially as follows:

On or about the 22d day of April, A. D. 1920, at the farm of Jacob Wolff, four or five miles from the village of Turtle Lake, in the county of McLean, state of North Dakota, one Jacob Wolff, his wife, their five children, and hired chore boy, Jacob Hofer, were murdered. The instrument used in committing the murder was a shot gun. On April 24, 1920, about noon of that day, one Jacob Kraft called at the home of Jacob Wolff, knocked at the door, and, receiving no response, opened it and found a room in disorder, with the floor covered with blood. The dead bodies of Mrs. Wolff, Jacob Hofer, and three of the Wolff children were found in the cellar in one heap, at the bottom of the steps leading thereto. About 30 feet in front of the barn there was considerable blood, and a trail of blood led thence into a shed attached to the barn, and there the dead bodies of Jacob Wolff, and two of his small children were found covered with hay. The bodies of the dead persons were left where found until Sunday, when an inquest was held. Photographs of

the bodies were taken about 2 o'clock Sunday morning, and before the bodies had been disturbed. Thereafter the bodies were removed, a post mortem examination held, and they were prepared for burial.

Upon the discovery of the crimes above mentioned, O. H. Stefferud, the sheriff of McLean county, N. D., and his deputy, Emil Haas, certain detectives, and Chris Martineson, chief of police of Bismarck, began a systematic and searching investigation with the view of discovering and apprehending the person or persons who committed the crimes. They interviewed the neighbors in the vicinity of the crime, taking from them affidavits as to their whereabouts on the day of the crime, and as to any knowledge or information they possessed which might assist in the discovery of the criminals. This investigation continued until about May 11, 1920. About this time the defendant, who was a farmer living about two and three-fourths miles north and east of the Wolff farm, was taken into custody and confined in the county jail at Washburn, McLean county. About 8:30 o'clock p. m. on the 12th day of May the defendant was taken to the sheriff's office, and there was questioned by two detectives, George D. McDowell, E. F. Hezner, Chris Martineson, chief of police of the city of Bismarck, and Sheriff Stefferud, of McLean county, and Haas, his deputy, with reference to the murder. At about 11:30, the deputy sheriff and Hezner, one of the detectives, retired. Those remaining continued to question Layer, and confronted him with conflicting statements, claimed by them to have been made by him in response to their inquiries. He was there shown photographs of the dead bodies, and finally acknowledged his guilt. He related in detail the manner in which he committed the crime; in other words, he made a written confession of his guilt, of which the following is a copy:

"Washburn, North Dakota, May 13, 1920

"I, Henry Layer, being first duly sworn, depose and say, that I make this statement out of my own free will, without any promise whatsoever; that on Thursday, April 22d, I left my own house at about 11:00 o'clock a. m. and walked about one mile south, following the section line, and then walked from the north into Wolff's farmyard, arriving there at about 11:30 a. m. I then walked into the house and there found Mr. Jacob Wolff, Mrs. Wolff, the five children, and the hired hand, Jacob Hofer. I began talking to Jacob Wolff, demanding damages for the injury done to my cow by Wolff's dog. I told Wolff to come and look at the cow and see for himself how much damage the dog had done to

my cow. Wolff then told me to leave his yard and go away. This conversation took place while I and Wolff were standing in the doorway leading from the storm shed into the house proper. I then told him not to get mad, and he (Wolff) got the gun, a doublebarreled shotgun, out of his front room. I then tried to take this gun away from him, and in the fight between Wolff and myself for the gun one shot went off, and then another in quick succession; one of the shots killed Mrs. Wolff. I did not see her fall, but saw her lay there. I then got the gun away from Wolff and then got more shells out of the bureau drawer in the front room, where I saw Wolff take two shells at the time he (Wolff) got the gun and then I reloaded the gun and began shooting. I do not remember at whom I shot first but I believe I shot at Jacob Wolff, who by this time had run out of the house across the yard towards the cow shed, and hit him, and I saw Jacob Wolff fall. I then went out of the house where Jacob Wolff lay, and fired another shot into Wolff's body. I then went into the cow shed, saw there Wolff's two girls, and shot them where they stood, in the northwest corner of the shed. I then returned to the house and there shot and killed the rest of Wolff's family. I then returned to the yard, carrying Wolff's coat, dragged Wolff's body into the shed, first covered the bodies of the two girls with hay, which I took out of the manger, threw Wolff's body on top of the pile, and the coat over Wolff's body, and then also covered his (Wolff's) body with hay; then returned to the house, opened the trap door leading from the kitchen into the basement, and threw the bodies of the dead laying about the kitchen, one after another into the basement, then put down the trap door. The reason I did not kill the baby was, I believe, because I did not go into the room in which the baby lay. I then pulled loose the telephone wires from the instrument. I then left the Wolff house, carrying the gun, closing the doors behind me as I walked out.

"Before leaving the house, I picked up all the empty shells, carrying them with me also. I then broke the gun, carrying the same, walked south through Wolff's yard towards the slough which I knew was there. When I got to the slough I threw the broken gun and shells I had in my pocket into the slough, and then turned east on the north side of Brekken lake until I came to the draw leading north, and following this draw to the hills, and then crossed the hill and cut over towards the road north of Wolff's farm, and then followed this road to my

house, a distance of about two miles. I don't know what time it was when I got home, but I believe it was about 2:30 o'clock p. m. · I will also add that, after I finished the shooting in the cow shed, I threw about three or four empty shells from the cow shed into the hay loft. through an opened door. This is the whole truth.

· (Signed) Henry Layer.

"Witness: George D. McDowell.

"Sworn and subscribed to before me this 13th day of May, 1920."

After having made and signed the above confession, the defendant signed the following written request, a copy of which is as follows:

"Washburn, North Dakota, May 13th, 1920.

"State of North Dakota, County of McLean—ss.:

"I, Henry Layer, having confessed to the killing of the Jacob Wolff family and Jacob Hofer, do hereby request that I may be taken before the district court at the earliest possible date in order that I·may enter my plea of guilty before the court and receive my sentence.

"(Signed) Henry Layer."

Thereafter, on the 13th day of May, 1920, he was taken before W. L. Nuessle, judge of the Fourth judicial district, in the court-house in the city of Washburn, McLean county. There was also present John E. Williams, state's attorney for McLean county, who appeared in behalf of the state, who, with consent of the court, then and there filed the written confession of guilt, and thereafter the information in writing, which charged the defendant with the crime of murder in the first degree, by effecting the death of Jacob Wolff in the manner and by the means set forth in the information. No question is raised as to the form and sufficiency of the information. The defendant in open court pleaded guilty to the charge contained in the information, as follows:

"State of North Dakota, County of McLean. State of North Dakota, Plaintiff, v. Henry Layer, Defendant. In the District Court, Fourth Judicial District. Written Admission of Guilt.

"I, Henry Layer, the defendant in the above-entitled action, having heard read the information in the above-entitled action, and knowing the contents thereof, do hereby admit that I am guilty of the crime of murder in the first degree as herein set forth. I further state that this

admission of guilt is made by me after mature deliberation, and without any promise of clemency or favor of any sort.

"Dated this 13th day of May, 1920.

"(Signed) Henry Layer.

"Witnesses:

"O. H. Stefferud.

"E. F. Hezner."

After the filing of the information, and prior to the time of the entry by the defendant of his plea, he was examined at great length by the trial court with reference to his legal rights where charged with such a serious crime. The court called his attention to the gravity of the crime with which he was charged, and that it was punishable by a very severe penalty. It informed him further of his right to the services of a lawyer who would appear for him. The defendant admitted he knew that the crime of murder in the first degree was a very serious one, and punishable by a severe penalty. He answered in the negative when asked if he wanted a lawyer, and stated several times in answer to questions that he did not want a lawyer. He was then arraigned, and entered his plea of guilty. Thereafter, and prior to the passing of sentence, the court entered into an extended examination of the defendant, making many inquiries with reference to the defendant's connection with the commission of the crime. The defendant at that time was also informed by the court that it was not necessary for him to answer questions about to be asked unless he desired to do so. His answers to these questions in substance affirm the truth of the matters stated in his written confession.

On this appeal, the defendant assigns four errors, all of which have been carefully considered. Two of them only need discussion. The first relates to the refusal of the court to grant a new trial on the grounds of newly discovered evidence. It impresses us as having no great weight.

John Hofer, in his affidavit, states:

"That on or about the 13th day of November, 1920, this affiant was repairing a water tank near the house when his little daughter, Martha Hofer, who was then about four years old came running up to him, holding in her hand a 12-gauge black shotgun shell and a woman's dust cap, upon which there were blood stains, and said to him, 'Look here what I found;' she then led this affiant to the place where

she said she found them; that the place where his daughter led this affiant was to a clump of bushes about 16 steps east of the Wolff house, and there this affiant found a piece of old brown paper and a piece of table oilcloth, which looked as though it had been wrapped around something. Affiant's daughter picked up the oilcloth and shook it as if she was trying to shake out something. Affiant further states that about two days later he saw two sons, ages 6 and 9, respectively, playing with two pieces of cloth; the younger son had one piece of cloth about 6x8 inches over his face using it as a mask to frighten his little sister. This mask had eyes, nose, and a mouth cut in it. This affiant scolded said son and made him take the mask off. The son then put on the other piece of cloth, which was about the same size as the first, but had no holes cut in it. Both masks had strings tied to the corners with which the boy tied them around his head. This affiant asked his said son where he found the masks, and he told this affiant that they were in the same clump of bushes where the said Martha Hofer found the cap and shell above mentioned."

Magdalena, wife of John Hofer, also made an affidavit which in some respects corroborates that of her husband.

John Hofer, Jr., son of John and Martha Hofer, made an affidavit to the effect that he found one of the masks about five or six days before his father saw the two smaller boys playing with them; that the mask he found was the blacker one of the two, and had no holes cut in it. He also states that he found it in the pasture east of the Wolff farm buildings about 12 steps from the fence. He states he picked it up and carried it to the house.

The affidavit of Mathias Kiemele, who has resided in McLean county for the past 18 years, and who owns a farm near Turtle Lake, which he had leased during the season of 1920, in substance shows that on the second day after the discovery of the dead bodies of the Jacob Wolff family, and during the month of April, he went to work on the Wolff farm; that he and his wife cleaned up the house and the premises, and that he finished seeding the land on the farm that was not seeded at the time that Jacob Wolff's family were murdered; that he took care of the stock on the said Wolff farm until the day of the sale; that from the day he commenced to work on the farm until the work was completed, a period of about two weeks, he was on the place every day; that he went over every part of the yard and over a large part of the farm, and that he

knows where the alleged and so-called masks were supposed to have been discovered by the Hofer children; that he had been over that particular place many times during the time he worked on the Wolff farm; that on the Sunday after the murder was discovered there were hundreds of people in the Wolff premises and in the yard, and that practically every foot of the land was gone over by the people, who were looking about for any evidence they might find which would help to throw light upon the question of who committed the murder; that after he finished the work on the Wolff farm he kept his stock in the Wolff pasture, and watered them at the Wolff farm well located on the Wolff farm, and went three times a week during the whole summer and fall; that he fixed up the fence which was within a very few feet of the place where the Hofer children are presumed to have discovered the so-called masks; that he seeded a small strip of ground which is within five or six feet from this fence; that the so-called masks are supposed to have been found in this strip of grass between the said fence and the ground seeded; that he did not see anything of the so-called masks at any time while on the Jacob Wolff farm; that he has seen the so-called masks which are in the possession of the sheriff, and which were this day shown him by Sheriff O. H. Stefferud, and that he never saw the same upon the Jacob Wolff farm at any time; that he also was shown the woman's dusting cap claimed to have been found on the Jacob Wolff farm by the Hofer children, and that he never saw the same on the Jacob Wolff farm.

The statements in Kiemele's affidavit are in several respects corroborated by the affidavits of Emanual Hofer and Sheriff Stefferud.

After careful consideration of all the affidavits on behalf of the defendant relative to newly discovered evidence, and considering the length of time since the commission of the crime until the new evidence is alleged to have been discovered, and considering further the proximity of the place where the new evidence was discovered to the house of Jacob Wolff, and that immediately after the crime all of the premises was carefully searched by the officers and masses of people for the purpose of discovering evidence which would lead to the detection of the perpetrator, it is unbelievable that the masks and other alleged new evidence could have been theretofore undiscovered. We are therefore certain that the trial court did not err in refusing to grant a new trial on the grounds of newly discovered evidence.

The second error assigned, and the last to be discussed, is to the ef-

fect that the appearance of defendant, his waiver of preliminary hearing upon the criminal complaint, and his trial under the criminal information were procured, and his plea of guilty to the information made by him while under duress, intimidation, coercion, and fear. The defendant submitted several affidavits in support of the motion. To a large degree they detail what he maintains were his movements, and where he was all of the time on Wednesday, April 21st, the day before the crime, and on April 22d, the day of the crime, and on Friday and Saturday immediately thereafter. In his affidavit he states,

"That on Wednesday, April 21, the day before the murder was alleged to have been committed, I got up at the usual hour of about 5:30, did my chores, got breakfast, and spent the forenoon in cleaning my plow, and getting it ready for the field work of that day. I had an early dinner, hitched up my team, and started to plow about 12 o'clock. I plowed continuously until about 7:30 in the evening, unhitched my team, came home, did my chores, ate supper, and went to bed. I was not away from my farm or off the premises during that day. On Thursday morning, the day the murder is alleged to have been committed, I got up at the usual hour of 5:30 o'clock, went to the barn, did my chores, harnessed six horses, had breakfast at about 7 o'clock, and immediately after breakfast hitched up my team and started to plow. I plowed continuously in the field near the house until about 12 o'clock, at which time I unhitched. I went to the house for dinner, put up my horses, gave them some hay, and went into the house to eat my own dinner. After I had finished eating, I went back to the barn and cleaned it, gave the horses some more hay before I went down to the well, a short distance north of the house, and pumped the tank full of water. I then returned to the house, stayed there until 2 or 3 o'clock; then hitched up my team and went to plowing again, and plowed continuously until about 7, when I unhitched and went home. I then did my chores, ate supper, and stayed home the rest of the evening. I never left my farm or premises at any time during the day of April 22d."

The affidavits attempt to show that defendant was occupied on Thursday in the manner above stated, so that the inference would follow, that, if he were so engaged, he could not have been on Wolff's farm on that day, and committed the crime with which he is charged and for which he has been convicted. It is here proper to notice that the time on Thursday between 12 and 3, when Layer states in his affidavit that he ate his dinner and stayed on his place during all of that time, is about the exact

time when the Wolff family and Hofer were murdered, for Layer in his confession states that he arrived at Wolff's about 11:30 a. m., and returned to his home at about 2:30 p. m.

Layer in one of his affidavits makes statements to the effect that the confession which he signed was procured by reason of threats of and abuse by certain officers of the law, and was procured by them by fear instilled into him by them and by their representations to him. In his affidavits he states:

"After supper on May 12th, I was taken to the sheriff's office and questioned and shown pictures of the murder scene. They kept up the questioning until about 2:30 a. m., at which time the sheriff, Martineson, and the gray-haired heavy-set man, whom I believed to be a railroad detective, took turns at questioning me. They repeatedly told me that there was a mob outside, and that my only chance of saving my life from being strung up on a telephone pole was to make a confession, and for them to get me out of Washburn. They cursed me, took my chair away from me, and made me stand until I was dizzy and faint. All this time I maintained that I was innocent, and that I knew nothing of the murder; finally, the man that I thought was a railroad detective beat me along the side of my head, and took me by the hair and pulled, after which he sat down across the table from me and related to me just how the murder happened, and told me what I would have to say, and then he got up and shook a billy club in my face and told me if I would not say what he wanted, he would beat my brains out. I then gave up, started to cry, and said I would do and say what they wanted. Martineson and the sheriff called in a large tall man, who wrote down the story that I was compelled to tell. Whenever what I said did not suit this man, who I thought was the detective, he would stop me and tell me what to say. They next called in Williams, state's attorney, and made me tell the same story to him as nearly as I could remember. The detective still kept correcting me and forcing me to say what he wanted.

"After this, I asked to send for my wife or Will Brokofsky, but they would not let me. The next morning I was taken before a magistrate, but was told before they took me out of jail that I must stick to the story that they told me the night before, and that my only chance to save my life and get away from Washburn was to stick to that story, and not ask any one for an attorney or for a trial. After leaving the magistrate's office I was taken back to jail for a few minutes, and then again taken out and rushed

down throughout the basement of the courthouse and up to where Judge Nuessle was; on the way over, the sheriff told me to run in going between the jail and the courthouse, in order' that no one would see me, for there was a mob in town who would get me if they could. When I was taken before Judge 'Nuessle, I again told the same story that I had been told the night before, believing. that if I did not it would cause me to be kept in Washburn, where I was afraid of being hung by a mob, or being killed in the jail by the man who beat me the night before.

"I further state that I never owned a double-barreled shotgun, and that I never saw the gun that was found in the slough near Wolff's home until after I was placed in jail."

He further states in his affidavits that he was in no way implicated in the murder, and that he is innocent of the crime for which he has been committed to the state penitentiary.

George D. McDowell was present all of the time on the night of May 12th during the examination of Layer in the sheriff's office. E. F. Hezner, another detective, was not present all of the time. He was the person who wrote the confession made by Layer. It was written about 2 a. m. on the morning of the 13th of May.

One Myrle Cook, who was acting as a barber in the penitentiary, made the following affidavit:

"Myrle Cook, being first duly sworn, deposes and says that he was acting as a barber in the State Penitentiary at Bismarck, N. D., at the time Henry Layer was brought to the institution, and that, after the day the said Henry Layer arrived at the penitentiary, this affiant shaved said Henry Layer and gave him a haircut; that when this affiant went to work on him, he noticed that said Henry Layer was badly beaten up, and that both sides of his face and the top of his head were swollen, and it looked as if some one had beat him. The skin was not broken, but was bruised and swollen. As he got into the barber chair, this affiant noticed that he had been beaten, and asked him what had done it. Layer replied that he had been hit over the head by the man who had charge of him before he was brought to the penitentiary, and he broke down and commenced crying, saying that he was innocent, and cried: 'Oh, my children, my children!' "

The affidavit of Dr. C. E. Stackhouse is as follows:

"Dr. C. E. Stackhouse, under oath, deposes and swears that he examined Henry Layer in the North Dakota State Penitentiary May 15,

1920, and found him in normal physical condition. There were two areas of ecchymosis on his face, one over each cheek bone, about the size of a silver dollar. There was no swelling."

The affidavits of Cook and Dr. Stackhouse were wholly contradicted by the affidavits of Chas. McDonald, then warden of the penitentiary, Felix Smith, an employee there, and Richard J. Wilde, another employee, who was then captain of the cellhouse, except that McDonald in his affidavit states that there was a red mark on his face.

The affidavit of one W. L. Brokofsky is to the effect that after Layer was confined in the penitentiary he talked with him, and that Layer told him he was innocent of the crime with which he was charged, and of the manner in which he had been compelled to sign that which was supposed to be a confession of the crime, and that his statements at the time were the same as herein set forth in his affidavit.

Lydia Layer, wife of the defendant, made an affidavit to the effect that she was at home the whole day of April 22d, the day of the crime; that she knew the whereabouts of her husband, and knew what he was doing that day; that he was engaged in farm work in the fields upon the farm and about the buildings, and did not leave, nor was he away from the farm any part of that day; that he was at the house at the noon hour, and had his dinner, and worked about the place doing the usual noon chores and odd jobs, and returned in the usual manner and time to his work in the fields.

No more of the contents of the affidavits filed in defendant's behalf need be set forth. All of the statements in them have been carefully considered. On behalf of the state there were filed affidavits by Sheriff Stefferud, Emil Haas, his deputy, C. J. Martineson, chief of police at Bismarck, M. Tellefson, clerk of the court of McLean county, and John E. Williams, then state's attorney of McLean county, which, taken together, are an absolute denial of the statements contained in Layer's affidavit with reference to threats made against him and the exercise of duress and abuse of him, and acts putting him in fear. Their affidavits deny any conversation with him concerning a 'mob, and state that there was no talk of that character during any of the time they were examining him at the jail. The affidavits are not only a complete denial of the contents of Layer's affidavits, but of all corroborating affidavits made in support thereof.

Each of such officials then held important and responsible positions.

They were unquestionably able, honest, and efficient officers. The fact that they were alert and active in seeking the perpetrator of these atrocious crimes is evidence that each was conscientious in the discharge of his duty. It is unbelievable that men and officials of this character could be guilty of the matters charged against them by Layer. Certainly they did not thus stultify themselves.

It is also to be remembered that, at the time Layer made his affidavits herein, he was an inmate of the penitentiary, and under the judgment and sentence of the court would remain so for the term of his natural life. He knew that, so long as life should continue, he would be prohibited from free association with the world outside; that he had forfeited for the remainder of his lifetime the society of his family, of his friends, and relations. He knew that the sun of his personal liberty had forever set; his future held for him no hope, no ray of light. In these circumstances the binding force and sanctity of an oath might mean little to him. He in fact would be suffering no additional penalty should he make a false affidavit. In these circumstances, he would be quite free and fearless in swearing to the statements contained in his affidavits. In view of the facts stated in the affidavits by the officials above mentioned, his statements and his and corroborating affidavits are entitled to no credit. It is true, as contended by the defendant in his brief, that under the constitution, one charged with crime is entitled to a trial by the jury, that he is presumed innocent until proven guilty, and that the state must prove him guilty beyond a reasonable doubt. It is likewise true that the defendant is the only person who can waive such rights. It is the law, however, in this state that the defendant has the right to waive, and the state to receive such waiver on the defendant's plea of guilty, and that upon such plea he may lawfully be convicted and imprisoned.    It is likewise true that such waiver of such privilege must be a voluntary one, and free   from   all duress, fear, intimidation, and coercion; that is, he must not be induced or compelled to make his plea of guilty by reason of threats, or in any way forced to do so. In other words, his plea must be free and voluntary.

.The appellant has cited a long list of authority which sustains this principle. Among others is Sanders v. State, 85 Ind. 318, 44 Am. Rep. 29; Little v. Commonwealth, 142 Ky. 92, 133 S. W. 1149, 34 L. R. A. (N. S.) 257, Ann. Cas. 1912D, 241; State v. Calhoun, 50 Kan. 523, 32 Pac. 38, 18 L. R. A. 838, 34 Am. St. Rep. 141. There is no doubt of the correctness of the legal principle stated in the above authorities, and other

authorities to like effect cited by the defendant. The rule there stated is the well-settled and general rule. It does not, however, apply to the case at bar. In those cases it was either admitted or established by competent proof that the plea of guilty was entered while the accused was under duress, or that it was procured by intimidation or coercion; in other words, it was not a voluntary one. Here, however, that condition does not exist. The proof entirely fails to show that the defendant was under duress, or that he was intimidated, coerced, threatened, or abused and maltreated, and thus induced to enter his plea of guilty. On the contrary the proof is quite conclusive that his plea was a voluntary one. If it could be established by competent proof that the defendant had by any means been coerced into entering his plea, or if any means were used to put him in fear, or if by fraud he was deceived, or if for any legal cause his plea was not free and voluntary when entered, all the proceedings thereafter occurring including his conviction and sentence would be a nullity. There is, however, no such proof.

While it is proper and lawful in this state for the trial court to receive a voluntary plea of guilty from one charged with crime, nevertheless the writer, speaking for himself only, is of the opinion that the ends of justice would be better subserved, where one is accused of a felony and offers to plead guilty, by rejection of such plea by the court, thus placing the accused upon his trial to the court and jury, providing for him, if necessary, an attorney who will protect and secure for him every right and privilege guaranteed him by the constitution and provided for by the law of the land. This would afford an opportunity to determine if a confession was voluntary in cases where a confession, in part, is relied on by the state to establish the guilt of the accused, and would as well afford the accused an opportunity to show that he did not make the confession, or, if he did, that it was procured by fraud, duress, coercion, etc. It would also afford him an opportunity of cross-examination of those who procured the confession from him, and as well an opportunity to assert every lawful right in aid of his defense.

But, as above stated, defendant waived all these and other privileges by law secured to him, and this, as the record shows, freely and voluntarily. Hence the order and judgment from which this appeal has been taken should be affirmed, and they are affirmed.

ROBINSON, CHRISTIANSON, BIRDZELL, and BRONSON, JJ., concur.