# STATE OF NORTH DAKOTA, Respondent, v. JOSEPH THRONDSON, Appellant.

### (191 N. W. 628.)

**Criminal law — capacity to understand act.**

1. The generally accepted test of responsibility for crime is the capacity to understand the nature of the act alleged to be criminal, and the ability to distinguish between right and wrong with respect to such act.

**Criminal law — defendant may waive rights.**

2. A defendant in a criminal action may waive his right to the services of counsel, the procurement of witnesses or a jury trial.

**Criminal law — evidence held to show mental capacity to commit crime.**

3. An examination of the record discloses that at the time of the killing the defendant was mentally able to distinguish between right and wrong and understood fully the nature of his act; that his confessions were made freely and voluntarily and with mental capacity to understand their contents and the legal effect thereof.

**New trial — no error in denying.**

*Held*—evidence held to show no fraud, misrepresentation, coercion or duress in procuring confession or plea of guilty.

The record shows that no undue advantage was taken of the defendant by the officers of the law or that he was advised or coerced, or forced to enter a plea of guilty. No disposition shown on the part of any of the officers to prevent the defendant from procuring the services of an attorney or having a trial if he wished. He was also admonished by the court as to his right, and for this and other reasons stated in the opinion it is held that the court did not err in denying defendant's motion for a new trial.

Opinion filed December 22, 1922.

Criminal law, 16 C. J. § 75 p. 100 n. 12; § 737 p. 401 n. 61; § 1586 p. 775 n. 68; § 2077 p. 821 n. 23; § 2624 p. 1125 n. 16. Homicide, 30 C. J. § 550 p. 304 n. 54 Juries, 35 C. J. § 105 p. 198 n. 58. Witnesses, 40 Cyc. p. 2156 n. 17.

Appeal from the District Court of Grand Forks County, *Cole,* J.

Defendant appeals from a judgment and from order denying motion for new trial notwithstanding the verdict.

Affirmed.

*Jas. A. Peterson* and *Edward P. Kelly,* for appellant.

*Theo. B. Elton,* for respondent.

Note.—On weakness of mind as affecting liability for criminal act, see note in 10 L.R.A.(N.S.) 999; 8 R. C. L. pp. 64, 175; 2 R. C. L. Supp. 532; 4 R. C. L. Supp. 518; 5 R. C. L. Supp. 442; 13 R. C. L. pp. 710–712; 14 R. C. L. pp. 599–602, 624.

McKenna, District Judge. Elmer Dezell was shot and killed by the defendant at the former's farm residence in Grand Forks county on the 28th day of December, 1919, and immediately following the shooting the defendant attempted suicide. On the evening of the same day on which the killing of Dezell occurred the defendant signed a written confession, and signed a second written confession on the 29th day of December, 1919, both of which admit the shooting of Dezell and set forth in detail the reasons and causes leading up to the shooting and the surrounding circumstances. Both of these statements were made while in custody and before any formal proceedings were instituted against the defendant. On January 13, 1920, a criminal information was filed against the defendant in the district court of Grand Forks county charging the defendant with the crime of murder in the first degree. On the same day the defendant was arraigned, entered a plea of not guilty and was sentenced to life imprisonment in the penitentiary. On January 12, 1921, the defendant made a motion for a new trial asking that the judgment of conviction be vacated and set aside, that he be allowed to withdraw his plea of guilty and to enter in lieu thereof a plea of not guilty, and that he be granted a jury trial upon the merits. The basis of the motion was that at the time of the killing he was suffering from shell shock and that he was not responsible mentally, and that at the time of entering his plea of guilty, he was in no condition physically or mentally to understand the nature of his act or the results of his plea and that he was prevented by the officers from procuring legal advice or having an opportunity to prepare for trial.

On the 13th day of January, 1920, in the district court of Grand Forks county, a criminal information was filed against the defendant, Joseph Throndson, by the state's attorney of that county charging the defendant with the crime of murder in the first degree, alleging that he did on the 28th day of December, 1919, in said county and state kill one Elmer Dezell by shooting him with a 25–40 caliber rifle. On the same day the defendant was arraigned in said court, Judge A. T. Cole of the First Judicial District presiding, and entered a plea of guilty to the crime as charged in the information. He was thereupon sentenced to life imprisonment in the penitentiary at Bismarck, where he has since been confined.

Some time later the defendant through his attorneys made an application to the state pardon board for a pardon, which was denied. On the 12th day of January, 1921, he presented a motion to the district court of Grand Forks county before Judge Cole asking that the judgment of conviction entered in his case on the 13th day of January, 1920, be vacated and set aside, that he be allowed to withdraw his plea of guilty entered therein and to enter in lieu thereof his plea of not guilty, that the sentence of imprisonment upon such judgment be withdrawn, and that he be granted a trial before a jury upon the merits. The motion was denied, and from this order of the district court entered on the 20th day of September, 1921, denying the motion and refusing to set aside or vacate the judgment of conviction in said cause the defendant has appealed to this court.

Elmer Dezell was shot and killed at his farm home near Emerado in Grand Forks county on the 28th day of December, 1919, by the defendant, Joseph Throndson. The only persons present at the time of the shooting besides the defendant were Nellie Dezell, wife of the deceased, and Clifford Dezell, a son. The defendant shot the said Elmer Dezell with a 25–40 caliber rifle, the first shot taking effect as the said Elmer Dezell stood in the doorway of a small wash room off the kitchen of his farm home. After the first shot Elmer Dezell ran through the house endeavoring to escape through the front door. The defendant followed him and shot him at least twice more before Dezell succeeded in getting out the front door where he fell on a snow bank near the house and died within a very few minutes. The defendant then turned the rifle upon himself shooting himself through the abdomen, but the wound was not serious and he recovered in about ten days.

On the 28th day of December, the defendant, after he had shot Elmer Dezell, and inflicted the wound upon himself, was taken to the Deaconess hospital at Grand Forks where he remained until discharged on the 7th day of January, 1921. From there he was taken to the county jail where he was detained until the 13th day of January, 1921, when he entered his plea of guilty of the crime of murder in the first degree and was sentenced to the state penitentiary at Bismarck for life.

The defendant asks to have the judgment of conviction set aside and that he be permitted to withdraw his plea of guilty and to go to trial upon the merits upon the following grounds:

First. That at the time he entered his plea of guilty he was not aware of his rights and did not understand the nature of the defenses which were open to him.

Second. That at the time he entered his plea he was not in a condition mentally to fully realize the meaning and consequences of his plea of guilty.

Third. That at such time he was not in condition to fully weigh and consider his rights, his defense to the charge and his condition at the time of the homicide.

Fourth. That at such time he was not in a condition or in a position to know or to find out what could or ought to be done in his behalf. In other words, that he was not in a position to know whether he had a defense or not.

Fifth. That at the time of making his statement to the state's attorney he was suffering from loss of blood, from the effect of hypodermic injections, from the excitement of the shooting and under a severe nervous strain.

Sixth. That he was so surrounded by the officers and state's attorney that he had no opportunity to seek advice or to secure the assistance of an attorney and figuratively the officers had him bound hand and foot while in a weakened condition.

Seventh. That at the time of the killing of Elmer Dezell the defendant was laboring under pressure of fear and illusion brought about by a mind so weakened and wrecked by shell shock that he was positively unable to control himself; that he was not responsible mentally for the shooting of Elmer Dezell, and that at the time of entering his plea of guilty before the district court he was in no condition physically or mentally to appreciate that he was not responsible for the murder.

To arrive at a just conclusion as to whether the contentions of the defendant have sufficient merit to warrant this court in setting aside the judgment of conviction and in order to throw light upon the mental and physical condition of the defendant at the time of the shooting and at the time of entering his plea, it is necessary to scrutinize carefully and methodically the statements as disclosed by the record in reference to the defendant, his life history, his associations with the deceased and the deceased's family, the motive for the murder, and the actions

and conduct of the defendant immediately preceding and following the murder and up to the time of his being sentenced to the penitentiary.

On December 28, 1919, the defendant Joseph Throndson was thirty-two or thirty-three years of age, was a powerfully built man 70 inches high and weighing 165 pounds. He was born on a farm near Baldwin, Wisconsin, had a common school education, and had followed the work of farm laborer all his life. He had known Elmer Dezell and his family for a long time, and had worked as a farm hand for Elmer Dezell covering a period of seven years, with the exception of thirteen months when he was in service during the World War. He was inducted into the army on the 13th day of March, 1918, was sent to Camp Dodge, Iowa, and remained there in training until April 20, 1918, when he was sent to France reaching the firing line in the month of July the same year. He was overseas about eleven months and took part in some of the most important battles of the war, namely, St. Mihiel, Meuse, Argonne, and the Verdun Sector. He was honorably discharged from military service at Camp Dodge, Iowa, on the 2d day of May, 1919, spent a week visiting his sister at his old home near Baldwin, Wisconsin, and then returned to the Elmer Dezell farm in Grand Forks county where he remained from May 1919 in the employ of Mr. Dezell until the day of the shooting on the 28th of December of the same year. During the entire period that he worked for Dezell and up to within two weeks of the shooting it appears that there was no trouble between them, except a minor instance in one of the earlier years of the defendant's employment and that Throndson was treated almost as a member of the Dezell family.

To ascertain a motive for the shooting of Dezell by the defendant we shall look first to the statements which the defendant himself made immediately following the shooting. His first statements were made on the day of the shooting after the physicians and coroner and neighbors had arrived at the farm home, and were made orally. These statements appear in the affidavits of Mr. E. Franklyn, cashier of the Farmers Bank of Emerado; Dr. G. A. McKay, a physician of Grand Forks county; Mr. Clifford Veitch, a farmer and resident of Grand Forks county for more than twenty-two years; Mr. Charles L. Emery, for seven years engaged in the farm machinery business in the village of Emerado; and Dr. R. M. McLean, county coronor and a practising

physician in North Dakota for more than thirty years. That upon talking freely with these men for about half an hour regarding the cause of his wound and the facts leading up thereto and the cause of his shooting Dezell, that Throndson informed the affiants as follows: "That he had had some sort of verbal quarrel with the said Elmer Dezell on said day, and that said Throndson had gone to the cook-car which was located alongside the kitchen of the said Dezell farmhouse and had taken a rifle therefrom and upon meeting said Dezell coming through the kitchen door he had shot at the said Dezell, and upon said Dezell turning and running into the house said Throndson had followed said Dezell and had shot at him several times as he was passing through the house, and had also shot at the said Dezell after he had passed out of the front door of said farmhouse, that when he had found that he had killed said Dezell he attempted to kill himself by shooting himself with the same rifle with which he had shot said Dezell." That at said time Throndson appeared to be very sorry and so expressed himself, stating that he had killed his best friend. That he had failed to kill himself because the gun slipped and the bullet went too low and instead of shooting himself through the heart the bullet went through his abdomen.

His next statement as to the cause of the shooting was made in the depot at Emerado the evening of December 28, 1919, while waiting for the train to take him to Grand Forks and to the hospital. This statement is in writing and is as follows:

"I, Joe Throndson, wish to make this statement regarding death of Elmer Dezell. This morning December 28th, he and I had a little trouble at the barn and when he went to the house I thought he was going to get a gun to shoot me. I went to the shack where I knew there was a rifle and took it and followed him to the house and shot him in the house. As nearly as I can remember he ran out the door and I shot him again out in the yard. After that I went back into the house and tried to kill myself by shooting myself in the breast. In this I failed as the bullet went too low."

This statement, which is known as Exhibit A, was made at the request of the defendant himself. It was written on a typewriter by Mr. E. Franklyn in the presence of Dr. R. M. McLean and signed by the defendant in their presence. At the time this statement was made

49 N. D.—23.

the defendant Joseph Throndson was smoking a cigar. He had not received any hypodermic or quieting drug of any kind, and according to the affidavits was apparently perfectly rational and cool and did not show any great mental excitement.

The next statement made by the defendant was on the 29th day of December, 1919, taken at the Deaconess hospital in the city of Grand Forks about 11 o'clock in the morning in the presence of T. B. Elton, state's attorney, C. C. Stewart, sheriff, and J. W. Lowe, deputy sheriff of Grand Forks county, and Frank Kilgore, stenographer. This latter statement was made after Dr. T. Mulligan, the county physician, had told the state's attorney that the defendant was physically able to stand such an examination, and after the state's attorney had told the defendant Thorndson the purpose of the examination. The state's attorney said:

Q. Before making a statement, however, Mr. Throndson, you understand, of course, that I am here in my official capacity as state's attorney, and any statements you do make will be used, of course, by me as state's attorney in connection with such prosecution as is commenced. You understand that?
A. Yes.
Q. Any statements you make, they will be of your own free will?
A. Yes.
Q. Without any fear on your part, or any promise by me?
A. Yes.

This statement of the defendant is too lengthy to place verbatim in the record. Its outstanding features are that the defendant claims that Elmer Dezell accused him of having improper relations with Mrs. Dezell. He said in part: "It has been kind of trouble, you know, for a year or so, that is, he accused me a couple of times, two or three times before. . . . This here was jealousy more than anything else. . . . You see I wanted to get away from the place because I was afraid of my life; I have been scared; I wanted to leave for the last couple of weeks, and the simple reason I didn't get away was because I was in the hole. . . . She told him some, but not as much

as I was. . . . She was keeping the time, and she didn't like to see me pick right up and leave.

Q. Why were you scared?

A. I heard him accuse me; that he would kill me.

Q. Did he ever say that he would harm you?

A. He said that if he ever caught anybody at it he would kill them.

Q. If he ever caught anybody with his wife, is that what he meant?

A. I suppose that is what he meant.

Q. But he didn't say that directly to you, did he?

A. Well, he referred to anyone; I suppose he meant me too. And yesterday morning, or the day before yesterday morning I wanted to go then; well, he was down in the field after corn; she says if you go now I will have to tell him, and there will be an awful mix-up. She says I would have to tell him what you went for. She says then there would be an awful mix-up, and it would be worse for me. I says to her if that is the case I will stay. And then the day this happened, that was yesterday, I made up my mind I wanted to leave the place anyway, because I was getting pretty scared. I thought I would just simply go away; and she told me not to go away; she says if you go I will have to tell him why you have gone and I spoke up and says you don't have to tell him, I will tell him myself, but I am going away, and there will be no trouble. And he has been accusing her before I think about me certain times. . . . *She went away yesterday morning. She went to see one of the neighbors. He was down there in the field after corn; and so I went down there—I got over to the neighbors before she got there, and I says you better come back with me, and there won't be nothing said, and I wont say nothing, and probably everything will pass over. I went over to get her back. She wouldn't come back. Then when I came back he started to ask me all kinds of questions. He saw that I was going to leave then.*

Q. Where was he talking to you?

A. That was at the house. She was down at the neighbors then; and he knew then—he said he knew everything what was going on. I says well if you know it, I says, I can go away from the place and there wont be nothing more said and I wouldn't show up any more. . . . He told me I will go and get her, and I will tell her that you are going. And I asked him then you ain't got any intention of harming me or

her, have you? No, he says, I haven't no intention of harming you, but if I caught you right at it I might harm you. I don't know what I would do.

Q. That is, he meant if he caught you and she having sexual intercourse?

A. Yes."

He then says that Mr. Dezell went over to the neighbors and brought Mrs. Dezell home, that they went into the house and he heard them wrestling around and heard Mrs. Dezell scream (which she denies in her affidavit) and that he thought Dezell was harming her, so he went into the cook-car and got the rifle and when Dezell opened the washroom door just off the kitchen he shot him. That the rifle belonged to both of them, half and half; that he thought maybe Dezell had a gun but wasn't very sure about it; that he shot because he wanted to protect Mrs. Dezell, and that he thought her husband was harming her. That he shot three shots, maybe four; that he followed Dezell through the house shooting at him; that when he found Dezell was dead that he figured on ending his own life.

"When I was in the war in France I sent $70 to her, Mrs. Dezell, and I says if I don't come back it is yours and if I do come back I will have that to go on." That the only talk he had with Mr. Dezell about the trouble with Mrs. Dezell occurred during the two weeks immediately preceding the shooting.

Q. Did he have any reason to suspect you of improper relations with his wife?

A. *He has never seen me that I know of. He has told her that he seen me and her the day before, but that was a lie because he never.*

Q. Did Mr. Dezell say anything to you when you went up to him as he was lying on the snow bank?

A. Yes, he says to me "get a doctor," he says, "Joe I am dying, get a doctor." But he didn't live very long.

Q. Is there anything else in connection with the affair that you would like to tell about now Mr. Throndson?

A. No I can't see anything because, as far as all I know I am the

one that done it, and I done it more to kind of protect myself and her than anything else as far as I can say.

Q. Just to be more clear, with reference to your talks with Mr. Dezell, you say about two weeks ago was the first time that he spoke to you about it?

A. Yes, about ten days or so, it was when we started to haul ice.

Q. That was the first time he started speaking to you about Mrs. Dezell, as I understand you?

A. Yes, and he spoke to her too. He spoke to her first after they went to bed. *She told me about it. She said "Elmer said something funny to me last night"* she says *"he has been accusing me—he asked me if you have ever asked me any such thing."* Then when we were out hauling ice out there, he says "I hear quite a bit about you and my wife," and ever since that I have been wanting to get away.

Q. But you had no severe quarrels about it with him?

A. Why no, because I asked him before he went down to get the Mrs. I says you ain't going to harm me or her, are you, and he promised me has wasn't going to harm us. So I stuck up for her.

The next statement made by the defendant was made to Judge Cole on the 13th day of January, 1920, at the time of the filing of the information and the arraignment and the plea of guilty. In this connection Judge Cole said: "You understand Mr. Throndson that you have a right, if you want it, to engage an attorney; the court will appoint one for you and grant you a trial by a jury if you want such a trial. That is your right. You have a right to be represented by counsel and go on trial before a jury. Are you ready at this time to enter a plea or do you want time to prepare and be tried before a jury; to engage counsel or have counsel appointed for you and prepare for trial and be tried before a jury, or are you ready to enter a plea now?"

The defendant: "I am ready to plead; yes, sir."

The court then informed the defendant of the nature of the crime and the punishment that would follow, and examined the defendant as to the circumstances surrounding the crime.

In his statement before the judge Throndson repeats practically the same story as told in the statement made before the state's attorney, except that he states that he knew where the gun was, that he took the

gun out of the house himself, that he took it out the day or morning of the 28th of December while Mr. Dezell had gone to the neighbors to get Mrs. Dezell. That when Mr. Dezell and Mrs. Dezell returned that morning from the neighbors that Mr. Dezell called the defendant to come to the house from the barn, and that on the way to the house he stepped into the cook-car, then came out of the cook-car and went toward the house, that when he heard Mr. and Mrs. Dezell wrestling in the house he went back into the cook-car and got the gun and walked up on the porch and when Dezell opened the door of the wash room leading out on the porch the defendant stepped back on the ground from the porch and then shot Dezell as the latter stood in the doorway.

The next statement which the defendant made with reference to the circumstances of the shooting appears in the affidavit made by him in the district court at the time of his motion to set aside the judgment of conviction, which affidavit was dated the 6th day of January, 1921, after he had been in the penitentiary nearly a year. This affidavit throws little new light on the details of the tragedy. In it the defendant endeavors to show that he has no clear recollection of what happened, that the shooting occurred under great stress and excitement, that he was suffering from shell shock, that his statement made in the hospital to Mr. Elton was made at a time when he was under the influence of narcotics, that his mind was bewildered and that he did not understand or comprehend just what he was doing or saying, and does not remember what he said in the court room at the time of his arraignment.

In addition to these statements of the defendant himself as to the causes leading up to the shooting and as to just what happened on the morning Dezell was killed, we have the testimony of Clifford Dezell taken before Judge Cole on the 13th day of January, 1920, and the affidavit of Nellie Dezell.

Clifford states that his father was shot in the back the first time, was just going in the door when Joe shot him, that he, Clifford, heard two shots in the house; that on that day Joseph Throndson took the shells out of the house and took them to the cook-car and loaded the rifle in the cook-car, and that that was just before the shooting. That there were two shot guns in the house, that one had two or three shells in it, and that Joseph Throndson loaded the other one shortly before the shooting; that his mother and father were kind of wrestling around in

the house just before the shooting and that was why Joe shot his father.

The affidavit of Nellie Dezell, the widow of Elmer Dezell, made on the 24th day of May, 1921, states that about two weeks prior to the 28th day of December, 1919, while affiant's husband was away from home, said Throndson made improper advances to her, and that upon her refusal to submit and stating that she would go to town and inform her husband, said Throndson got a shot gun and said he would blow his brains out if she told her husband or caused him to leave the place, and that he then promised to not act improperly again. That about nine o'clock in the morning of December 28, 1919, while her husband was gone from the house, Throndson again came to the house and talked with her and asked her to stay alone while her husband was gone to St. Paul so that he, Throndson, could stay with her the first night; that she then put on her hat and coat with the intention of seeing her husband, and that Throndson said he would blow his brains out and somebody elses; that she then went out of the house saying to Throndson that she was going to the home of her parents, Mr. and Mrs. J. W. A. Kenmir, that affiant walked down the road, and upon looking back saw Throndson run out to the barn and later observed him coming down the road with the team, and that she then cut across the fields to the farm home of Mr. E. Conn, and that Thronsdon overtook her just as she was entering the farm yard; that Thronsdon asked her to come back and not cause him any trouble, but she refused to go. That later her husband came to the Conn home with a team and sleigh and took her back. That when she reached the farm home she and her husband went into the house, and that upon passing through the kitchen she looked out and saw Throndson come hurriedly out of the barn toward the house; that Throndson stopped at the cook-car and got the gun, and when her husband opened the kitchen door to see where he was going that the defendant shot him and followed him through the house shooting again, and that Throndson then threatened to kill her, but she pleaded with him not to do so saying she would take the blame for the murder upon herself.

From all of these statements and affidavits it is apparent that the cause of the shooting was the relationship existing between Mrs. Dezell and Throndson. That Throndson was afraid that Mrs. Dezell would

either tell her husband or that her husband would force a confession from her and that Dezell would then visit his wrath on Throndson, and that he prepared for just such an emergency by loading the rifle and the shot gun so that whether in the house or out of it he would have a weapon with which he could kill Dezell if necessary. There was no assault on the part of Dezell, no threats of violence, no apparent immediate danger to be apprehended by Throndson, unless, perhaps, a guilty conscience made him a coward and abnormally afraid of some injury to himself or to Mrs. Dezell. Dezell was unarmed. Throndson had every opportunity to leave the place and prevent a tragedy. Either his past misconduct or an infatuation for the woman made him stay. When he was in France it was to her that he sent his money. When he wanted wages he went to her. She seems to have overpaid him. There must have been a close and friendly relationship between them if nothing more criminal. It was to save her appearing in court and testifying that he wished to avoid the publicity of a trial and entered his plea of guilty. He frankly stated that he did not wish to bring Mrs. Dezell into court? Why? Either because he wished to save her the disgrace that would follow the truth, or that he felt his story would not bring him much credit or sympathy. He had no grudge against Elmer Dezell. Immediately following the shooting he insisted on stating that he was sorry and that Elmer Dezell was his best friend. There is every indication then from the record that the shooting was not just the result of unusual excitement or anger, or the result of immediate fear of great bodily injury to himself or Mrs. Dezell, but that he deliberately planned the shooting in case Dezell should tax him with his misconduct toward Mrs. Dezell. The fear that Dezell would ascertain the facts was uppermost in his mind and he determined that if such a thing threatened he would put Dezell out of the way. Suicide following such murders is often the result. A criminal love affair, the fear of the husband ascertaining the truth, followed by the killing of the husband would be ample reason for the attempted suicide following the shooting, and is not strong evidence of a diseased mind, any more than that all murders and suicides are evidence of some mental derangement.

There is nothing in the record that shows that any undue advantage was taken of the defendant by the officers of the law or that he was ad-

vised or coaxed or forced to enter a plea of guilty. His brothers were permitted to visit him at the hospital immediately following the shooting, were allowed to talk with him freely; there was no disposition shown on the part of the state's attorney or any of the officers to prevent the defendant from securing the services of an attorney or having a trial if he wished. The court also admonished him as to his right, but the defendant freely and voluntarily waived his right which, as stated by our court in the case of State v. Layer, 48 N. D. 366, 184 N. W. 666, is a right which the defendant can forego.

We now come to the main ground of the application made by the defendant for setting aside the judgment of conviction, namely, that at the time of the commission of the crime, and at the time of the entry of his plea of guilty he was mentally incapacitated by reason of suffering from shell shock following his war experience. In this connection we cannot lay much stress or rely too strongly on his own affidavit or the affidavit of his counsel. It is very natural, perhaps, that after being in the penitentiary for a year and realizing that a lifetime in prison is a dread prospect that he should look about for some means of escaping the punishment due to his crime and should grasp at the idea of shell shock, and that he should regret not having taken advantage of such a defense under a plea of not guilty. However, the fact that by the assistance of able counsel he might have secured a conviction of murder in a lesser degree, or by the building up of a clever defense might have secured immunity from punishment, is no ground for relieving him of the burden of his crime if he knowingly, willingly, voluntarily, and with a full understanding of the nature of the crime which he had committed and the punishment which would follow entered his plea of guilty.

We must look for extrinsic proof. The only nonmedical testimony which we have to aid us is the affidavit of Ida Throndson, his sister. However, she had the opportunity of observing him for but a week covering a period of seven years. This was immediately following his discharge from the army in May, 1919, when he visited her at his old home in Baldwin, Wisconsin. She says that he appeared to be very nervous and easily excited, and further that when he was asleep she could hardly awake him that he slept so soundly. Her affidavit can not be said to prove a diseased mind, or tend strongly in that direction.

The next affidavit for the defendant is that of Dr. Julius O. Arnson of Bismarck who examined the defendant at the penitentiary on the 2d day of December, 1920. He says: "There is in the life history of his, Joe Throndson's, life nothing unusual or anything indicating any mental disturbance, with the exception that he has been below the average in intelligence. There is nothing to indicate that there was any mental derangement previous to his entering the service of the United States Government in the army." He further states that he does not see any evidence of any mental trouble at this time, but that it is reasonable to suppose that due to his war experience he might be provoked by unusual excitement or severe nervous strain of any kind. There is nothing in this affidavit to show that the defendant was suffering from shell shock or from any mental derangement either at the time of the shooting or any time thereafter, or that he has not been at all times in clear possession of his usual mental faculties.

The remaining affidavit in support of the defendant's theory is that of Dr. John Even Engstad. This affidavit is highly interesting from a theoretical, imaginative, and literary viewpoint. The doctor very graphically described what might happen, or what thoughts might enter the mind of a highly intellectual and supersensitive individual when surrounded by the horrors of war. His conclusions are all based on statements made by the defendant, not by any physical condition which he himself finds. It is to a large extent a restatement of the facts as given by Throndson himself vivified and enhanced by the picturesque imagination of the doctor, and is not at all convincing as expert testimony of an actual mental condition.

Opposed to these affidavits of Ida Throndson, Dr. Arnson, and Dr. Engstad are the affidavits of the physicians in charge of Throndson immediately following the shooting; the nurse who had charge of him in the hospital; the sheriff and his deputies; supported by the affidavits of some eight or ten respectable citizens of Grand Forks county who knew Throndson during all the years he worked for Dezell. A summing up of these affidavits is to the effect that Throndson was just the same in every respect after he returned from the army as before, that he never indicated any signs of excitability or nervousness or mental strain. That even after the shooting he was particularly cool, calm, and collected. Was even able to remember that he had made an error,

or that Mr. Franklyn had made an error, in the affidavit made by him in the depot waiting room at Emerado on the evening of December 28, 1919, which affidavit reads that he had procured the rifle from the shack. In his statement made the next day he corrects this and states that he procured the rifle from the cook-car and that Mr. Franklyn and the others must have misunderstood him.

"The generally accepted test of responsibility for crime is the capacity to understand the nature of the act alleged to be criminal, and the ability to distinguish between right and wrong with respect to such act." Philbrick v. State, 105 Neb. 120, 179 N. W. 398; Osborn v. State, 143 Wis. 249, 31 L.R.A.(N.S.) 966, 126 N. W. 737; State v. Mewhinney, 43 Utah 135, L.R.A.1916D, 590, 134 Pac. 632, Ann. Cas. 1916C, 537; 16 C. J. 100.

The defendant in our opinion has failed to establish that in entering his plea of guilty he was deceived or induced to enter it either through fraud or misrepresentation or a misunderstanding of his legal rights. He has failed to establish that his plea was not free and voluntary when entered and that all the proceedings thereafter including his conviction and sentence were not thoroughly understood by him or that the sentence of conviction is unreasonable or unjust. He has failed to establish that at the time of the commission of the crime his mind was unbalanced, or that he was suffering from shell shock or any nervous disease which prevented his mind from acting openly and understandingly, or that he had not the ability to distinguish between right and wrong.

This matter, too, was before the district court. The district court had an opportunity of seeing and examining the defendant at the time that he entered his plea and was thus in a better position to realize the physical and mental condition of the defendant than this court can be from the mere reading of affidavits, and the fact that the district court has denied the petition or motion of the defendant to reopen his case must necessarily carry some weight with this court.

It follows that the order and judgment from which this appeal has been taken is hereby affirmed.

BIRDZELL, Ch. J., and GRACE, and PUGH, JJ., concur.

ROBINSON, J., concurs in result.

CHRISTIANSON and BRONSON, JJ., disqualified, did not participate, Honorable GEO. M. MCKENNA and Honorable THOMAS H. PUGH, Judges of the Third and Sixth Judicial Districts, sitting in their stead.