No. 28,533.

The State of Kansas, *Appellee*, v. Owen Oberst, *Appellant*.

(273 Pac. 490.)

Opinion filed January 12, 1928.

*John Madden, John Madden, Jr., L. C. Gabbert,* all of Wichita, *Fred Ice,* of Peabody, *Ezra Branine* and *Alden E. Branine,* both of Newton, for the appellant.

*William A. Smith,* attorney-general, *Leon W. Lundblade,* assistant attorney-general, *Stanley Taylor,* county attorney, and *William Calkins,* assistant county attorney, for the appellee.

The opinion of the court was delivered by

Dawson, J.: This appeal presents for review certain proceedings in the district court of Butler county wherein a seventeen-year-old boy was sentenced to imprisonment for life upon his plea of guilty to the murder of his father and mother and his five brothers and sisters.

None of the facts concerning this seven-fold tragedy was developed in court by sworn testimony; and aside from a few inferences which may be gleaned from the record this court is entirely without dependable data upon which an intelligible statement of the case can be formulated. It seems, however, that the defendant, Owen Oberst, a lad of seventeen years, resided on a farm in Butler

county with his parents and younger brothers and sisters, and that he attended high school at some distance from his home. And it may be inferred that all the members of his family except himself died a violent death at the farm home on April 20, 1928, although the record is altogether silent of facts to establish the *corpus delicti* or, more simply, that seven murders had been committed.

On May 5 the defendant was arrested on the charge of having murdered his entire family with a .22-calibre rifle. He was taken before a justice of the peace, where he apparently waived a preliminary examination and was bound over to the district court, and on the same day an information was filed charging him in seven counts with murder in the first degree. It may be inferred, also, that some sort of confession was made by defendant, but what, when, or to whom, does not appear. However, on the day of defendant's arrest and waiver of a preliminary examination the presiding judge of the Butler county district court appointed eight persons as a commission,

"To investigate and confer with the defendant as they desired and to report generally as follows: whether any undue influence or coercion was used by any of the officers in securing any confessions or admissions from the accused in the above action."

An explanation of this strange procedure is given in the brief of counsel for the state:

"As soon as the confession became public, numerous people in and around El Dorado at once began questioning the officers' conduct, intimating coercion and third-degree methods, *and it was for the protection of the officers* as well as the defendant *that the court appointed the commission* of eight of the most reputable citizens of Butler county, four of them being attorneys, one a doctor, one a banker, another a teacher in the public schools and director of Boy Scout work, and the minister of the First Christian church of El Dorado, all gentlemen of the highest integrity and in whom the public at large had the greatest confidence. *The court knew that these gentlemen would return a finding of what the true situation was as they found it, and that this report would be made public, and in that way attempted to satisfy the public* that no undue influence had been used on the defendant, and that every right of the defendant had been protected and that he was fully advised of all his rights."

Four days later this "commission" reported their doings in writing, in part, viz.:

"We called the accused before us, caused him to be introduced to all the members of the commission, explained to him that the court had appointed us for the purpose of guaranteeing to him fair, proper and lawful rights, which he or any person accused of crime has. . . .

" . . . The commission asked many questions seeking to clear up apparent impossibilities in the statement, but were unable to get any clearer statement, defendant saying he did not recollect details which seemed important to us but which were not covered in the statement.

"We spent much time on hearing and assimilating the story of the defendant because of the gravity of the charge, and some inconsistencies in the statement of the details thereof, and also because of the immaturity of the accused and his apparent unfamiliarity with such matters and proceedings, and we desire to report as follows.

"1. That no undue advantage has in any way been taken of the accused by any of the officers; that his statements [record silent as to nature of these statements] have been free, voluntary and repeatedly made, sometimes varying in certain respects, but that in the main and as a conclusion of the matter, his statements have been made entirely without coercion or other overt influence, and wholly as a result of questioning or talking alone, and with no resort to violence or physical means or methods."

Following this report of the committee of eight, the judge's minutes, which supply the only record, recite:

"May 9, 1928. Defendant present in person and inquiry made of him whether he had seen the information filed against him and he having said no he was furnished with a true copy thereof and inquiry was made of him whether he desired the court to appoint an attorney to represent him, and he replied that he did not care, and thereupon the county attorney read the information on file, in open court, and the court inquired of the defendant whether he desired to plead guilty or not guilty, and he replied that he plead not guilty."

It does not appear what next ensued upon defendant's plea of not guilty, but a week later, according to the judge's minutes, the following transpired:

"May 16, 1928. Defendant present and states in open court that he desired to plead guilty to the crimes of murder charged in the information. Court asked the defendant if he desired the court to appoint him an attorney or counsel and he replied that he did not care. Thereupon the court asked defendant how he desired to plead and he replied he desired to plead guilty to each of the offenses charged in information. The plea of not guilty was set aside and the court asked the defendant if he had any legal cause to show why the court should not sentence him, and he replied that he had none, and thereupon the court adjudged that the defendant be confined in the Kansas State Penitentiary for term of his life on first count, and a like separate sentence on counts, two, three, four, five, six and seven, and pay costs."

A week later counsel for defendant appeared in the case for the first time. They filed a motion to remand the cause to the justice of the peace for a preliminary hearing for various reasons, viz.: that defendant had appeared there without counsel, that he was a

farm boy of seventeen years and ignorant of his rights and wholly ignorant of the procedure and language used in the proceedings before the justice of the peace, that he had had no counsel until May 20, and that his attorneys could learn nothing of the status of his case until May 22, and that he had been denied his constitutional right to the assistance of counsel for his defense.

Two days later counsel for defendant also filed a motion to vacate the judgment and sentence and to permit defendant to withdraw his plea of guilty, on the ground that he was a minor seventeen years old and had no counsel to defend him and was ignorant of his rights, and that his first consultation with counsel was on May 20 after the judgment and sentence of the court had been imposed.

Thereafter, on June 1, 1928, counsel for defendant filed a verified motion to require the sheriff to permit defendant to confer with his counsel, alleging that the sheriff and jailer had refused counsel the right to see the defendant, and that—

"3. The said sheriff, in so refusing and continuing to refuse and in so preventing and continuing to prevent counsel from seeing this defendant, when asked for his reasons for so refusing and preventing counsel from seeing their said client and conferring with him, gave as his sole and only reason that he desired to see the defendant put in the penitentiary, and that he, the said sheriff, intended to see that he was put in the penitentiary by every means at his command, and that he refused counsel permission to see their said client for fear said counsel would thwart said sheriff in his purpose of causing the said defendant to be put in the penitentiary.

"5. Defendant, through his said counsel, states that he is a minor without guardianship; has been sentenced without counsel to the penitentiary for life seven times under one indictment of seven counts for the murder of seven different persons. That he secured the said attorneys as his counsel after such sentence so imposed at and during the present term of this court. That said counsel has filed in this cause, and there is now pending before this court two motions, one to remand for a preliminary hearing, and the other to vacate the judgment and sentence of this court and permit the defendant to withdraw his plea of guilty. That upon the disposition of same, imperative action, involving many facts and circumstances wholly within the knowledge of the defendant, must of necessity be immediately performed by counsel, and to deny counsel access to defendant at this time is a suppression of facts essential to orderly justice."

In the affidavit in support of this motion it was recited:

"That when said attorneys asked him the reason for refusing them an interview with their said client, the said sheriff gave as his only reason and repeatedly stated during said interview for so denying affiants' entrance into

said jail, 'I want to take him up to Lansing to the penitentiary, and I intend to do it if I have my way, and if I let you lawyers in to see him I don't believe I will ever get to take him to the penitentiary.' And that the said sheriff, E. E. McKnight, further stated, 'You will never get in to see him as long as I am sheriff unless you go up to Lansing and see him there.'"

It may also be inferred that counsel for defendant wrote a letter to the presiding judge advising him of the filing of these motions, as on June 5 the judge wrote to counsel for defendant:

"Now in regard to your motion for permission to see Mr. Oberst will say that if you want to see him before Saturday you will please take the matter up with Mr. Taylor [county attorney]. He will arrange for you to see Mr. Oberst before Saturday if you care to do so. I talked the matter over with him when I was home and told him that the law gives a defendant the right to consult with his attorney at reasonable times, and I understand he agrees with me."

On June 9, 1928, these motions came on for hearing. The motion to remand for a preliminary examination, and the motion to set aside the judgment and to permit defendant to withdraw his plea of guilty were overruled. The motion to require the sheriff to permit defendant to confer with counsel was sustained. As to the latter the court itself prepared the journal entry, reading—

"The court, after hearing the argument and statement of counsel and being fully advised in the premises finds that heretofore, to wit: On the 5th day of June, 1928, the defendant's counsel was given written permission by the court to confer with the defendant, and at this time the court again grants defendant's counsel permission to confer and advise with his attorneys and thereupon they did confer with the defendant herein."

A motion in arrest of judgment was filed, setting up various grounds, including one that the whole record was insufficient to support a judgment. This motion was overruled, and seven life sentences were imposed on defendant, one for each count in the information.

Counsel for defendant assign and argue various errors suggested by matters outlined above—error in denying defendant's application to remand for a preliminary hearing; in appointing the committee of eight to investigate the conduct of the county attorney and sheriff and the circumstances of an undisclosed confession of defendant; in arraigning defendant and setting aside defendant's plea of not guilty and entering a judgment of conviction upon a plea of guilty without the advice of counsel; in denying defendant's motion to vacate the judgment and to permit him to withdraw his plea of guilty; in over-

ruling motion in arrest of judgment; and in abuse of the trial court's discretion as disclosed by the entire record.

This entire assignment of error centers about the final error suggested by the record, so we might as well lay hold of it at once.

Did the trial court abuse its discretion in conducting these proceedings under review, permitting the seventeen-year-old defendant to withdraw his plea of not guilty to seven separate and distinct charges of murder in the first degree, and to accept his plea of guilty on all of those felonies, and in imposing seven separate sentences of life imprisonment thereon, all without the advice of counsel, and in declining to undo any of those proceedings at the solicitation of counsel for defendant after they had been employed in his behalf?

It is part of our fundamental law that a person on trial for a crime is entitled to the assistance of counsel for his defense (Bill of Rights, § 10). This right is intended to be adequately secure by our penal code (R. S. 62-1304), and the same doctrine is as thoroughly emphasized in our criminal jurisprudence as any one matter treated in the 125 volumes which chronicle the judicial deliberations of this court. In *State v. Moore*, 61 Kan. 732, 60 Pac. 748, it was declared that "a person accused of crime is entitled to the assistance of counsel at every step and stage of the prosecution." In that case the defendant did have counsel, but he was required to plead in their absence. This court held that the incident was a "denial of a fundamental right and was material error." In the court's opinion it was said:

"In order that the accused may have the full benefit of this fundamental right, the legislature has provided that when he is about to be arraigned upon a charge of felony, and is without counsel and unable to employ any, it is the duty of the court to appoint counsel to conduct his defense, upon request. (Gen. Stat. 1897, ch. 95, § 160; Gen. Stat. 1899, § 4410.)

"So important is the presence of counsel regarded that it has been held to be error for the judge to repeat an oral charge to the jury in the absence of counsel for the defendant. (*State of Louisiana v. Davenport*, 33 La. Ann. 231.) In *People v. Trim*, 37 Cal. 274, it was held to be a fatal error for the court to give further instructions to the jury in the absence of the defendant's attorney, although the defendant himself was present. In another case it was held that the accused could not be deprived of the guaranteed right to be represented by counsel because he was a lawyer, and that to compel him to proceed without counsel was a plain and palpable violation of a fundamental right. (*People v. Naethaly*, 105 Cal. 641, 39 Pac. 29.) His right is not limited to proceedings at and subsequent to the impaneling of the jury, but he needs and is entitled to counsel at every step and stage of the prosecution. It has been held that an

accused person imprisoned and awaiting the action of the grand jury has a constitutional right to a private interview with counsel, and that such right could be enforced by mandamus. (*The People, ex rel. Burgess, agt. Risley,* 66 How. Pr. 67; 13 Ab. New. Cas. 186.) In *State v. Summers,* 4 La. Ann. 26, where it was claimed that a prisoner was denied the aid of counsel in exercising his right of peremptory challenge of jurors, it was decided that he had an undoubted right to such aid, and that no verdict could be sustained where it was refused." (p. 734.)

In *The City of Salina v. Cooper,* 45 Kan. 12, 25 Pac. 233, the defendant was arrested and brought before the police judge on a charge of violating a liquor ordinance. He pleaded guilty and was sentenced accordingly, but afterwards he filed a motion for leave to withdraw it. This was denied and he appealed to the district court, where he made a showing that when arrested he was promptly brought into police court, that he had no lawyer to defend him and that he had no opportunity to employ counsel, and while he admitted in police court that he had sold liquor he was not guilty of a misdemeanor for reasons not here pertinent. The trial court refused to allow him to withdraw the plea entered in police court and refused to enter his plea of not guilty. He appealed. This court reversed the judgment, saying—

"We think the court below, upon this showing, should have sustained the motion, and permitted the defendant to withdraw the former pleas of guilty entered against him by the police judge. All fairness should be accorded to a defendant in a criminal case, in every stage of an examination or trial. No advantage should be taken on account of his being in court without counsel. It always should be one of the first duties of a court, where a defendant is charged with a crime and is about to be called upon to plead, to inquire whether he has or is able to procure counsel; and if not, and he desires it, to see that he has an attorney to represent him. When a plea of guilty has been entered against a defendant, who is without counsel, and there is a question as to whether he intended to plead guilty, the court should permit the withdrawal of such plea in furtherance of the substantial rights of the defendant." (p. 15.)

In 2 Bishop's New Criminal Procedure (2d ed.) 619, it is said:

" § 795. Undoubtedly a prisoner of competent understanding, duly enlightened, has the right to plead guilty instead of denying the charge. Yet in proportion to the gravity of the consequences the court should exercise caution in receiving this plea. Thus, where one tendered it in a capital case, the judges would not accept it till they had explained to him its serious nature, sent him back to his cell for reflection, brought him again into court, had the indictment read to him a second time, and examined witnesses as to his sanity, and whether or not promises of clemency had been made to him. These steps are not in form taken in all cases, but they illustrate an ever-

present caution. And in some of the states there are varying statutory and other like devices to protect defendants from improvident pleas of guilty."

In Heard's Criminal Pleading (1879) 263, it is said:

"If it appears to the satisfaction of the court that the defendant rightly comprehends the effect of his plea, the plea of guilty is recorded, even in a capital case, and nothing further is done unless a motion in arrest of judgment is interposed, till sentence is awarded."

But in the annotation supporting the above text the same author says:

"The courts, however, are usually backward in receiving and recording such a confession, at least in highly penal cases, and will generally advise the defendant to retract it and plead to the indictment. 2 Hale P. C. 225. 4 Stephen Comm. 394, 7th ed.; *Commonwealth v. Battis,* 1 Mass. 95."

In 1 Greenleaf on Evidence (16th ed.) 349, 350, it is said:

"Judicial confessions are those which are made before the magistrate, or in court, in the due course of legal proceedings; and it is essential that they be made of the free will of the party, and with full and perfect knowledge of the nature and consequences of the confession. Of this kind are the preliminary examinations, taken in writing by the magistrate, pursuant to statutes; and the plea of 'guilty' made in open court to an indictment. Either of these is sufficient to found a conviction, even if it be followed by sentence of death, *they being deliberately made,* under the deepest solemnities, *with the advice of counsel,* and the protecting caution and oversight of the judge. . . .

"In the United States, the prisoner's confession, when the *corpus delicti* is not otherwise proved, has been held insufficient for his conviction; and this opinion certainly best accords with the humanity of the criminal code, and with the great degree of caution applied in receiving and weighing the evidence of confessions in other cases, and it seems countenanced by approved writers on this branch of the law."

In the Kansas cases cited above, one of the defendants was merely a horse thief and the other a liquor vendor, both grown men. In the case before us the defendant was a seventeen-year-old boy charged with seven murders. The one thing this youngster needed more than anything else before pleading guilty to such a horrifying accusation was consultation with and the advice of a good lawyer, and it is not easy for us to grasp the attitude of the trial court which quite overlooked a precaution so essential to the due administration of justice. By way of contrast, it is worth while to consider how the murderer of President McKinley was dealt with in the criminal courts of New York as recorded in 14 American State Trials, 159 *et seq.* When Leon Czolgosz was arraigned in the

county court at Buffalo, N. Y., for the murder of the president, the fact of his guilt of that shocking crime was known around the world, but every step in the state's procedure for the administration of justice was scrupulously observed nevertheless. The record recites:

"September 16 [1901].

" . . . At 5:40 the prisoner was brought into the county court. . . .

"MR. PENNEY, district attorney: Czolgosz, have you a lawyer?

"The prisoner shook his head and when the question was repeated he gave a simple stare.

"MR. PENNEY: Czolgosz, you have been indicted for murder in the first degree. Do you want counsel to defend you? Look at me and answer.

"The prisoner remained mute.

"MR. PENNEY: As the accused declines to answer, I suggest that counsel be assigned by the court to advise him what to do and to defend him.

"THE COURT: Czolgosz, you have appeared for arraignment in court without counsel. The law makes it the duty of the court to assign counsel for you. . . . The court therefore assigns the Hon. Loran L. Lewis and the Hon. Robert C. Titus as your counsel." (pp. 164, 165.)

On motion the case was transferred to the supreme [trial] court where the defendant was again arraigned. The same record (pp. 169, 170) reads:

"THE COURT: Czolgosz, you are indicted and charged with having committed the crime of murder in the first degree. It is alleged that you on the 6th day of September of this year unlawfully shot and killed William McKinley contrary to law, how do you plead?

"THE PRISONER: Guilty.

"THE COURT: That plea cannot be accepted in this court. The clerk will enter a plea of not guilty and we will proceed with the trial.

"MR. PENNEY: This defendant appeared in the county court last week, and at that time Judge Emery assigned as his counsel the Hon. Loran L. Lewis and the Hon. Robert C. Titus, and his associate, Mr. Ladd, to attend to the case and ascertain the rights that this man had and to put in such defense as to them they deemed best. They are here to attend to that in this court this morning. I will ask Your Honor to confirm that assignment. . . .

"THE COURT: It certainly accords with the views of this court that gentlemen like yourselves [Messrs. Lewis, Titus and Ladd] should have been appointed by the county court to defend this prisoner. It gives to the public and the court, and those engaged in the administration of the law absolute assurance that the prisoner will receive fair treatment during the progress of this trial, and that he will meet with such justice as the law demands in his behalf as he is assured by the fundamental law of the land. . . . It is my pleasure to not only confirm, but if it should be deemed necessary, appoint and designate you to the task which you have set out to perform."

There is not in Kansas, as in New York and elsewhere, a positive

statutory inhibition against a plea of guilty in a case of murder in the first degree; but how much better would it have been in this case if the county attorney had followed the example of the district attorney in the Czolgosz case, or if the trial court had drafted one or more of the lawyers who served on that "commission" to represent the youthful defendant.

To uphold the proceedings under review, the best that counsel for the state are now able to do is to recast the question this court has to solve into an inquiry whether it was error for the trial court not to force counsel upon the defendant whether he wanted counsel or not. And the literalism of the statute (R. S. 62-1304) is seized upon to justify such a formulation of our problem. Such has never been the interpretation of our bill of rights, nor of our statute, nor our own decisions or those of any American or English court in modern times. It is suggested that there are many prisoners incarcerated in our penal institutions on pleas of guilty given without advice of counsel. We doubt that, and would be sorry indeed if it were true, particularly, if they are 17-year-old lads who without legal advice pleaded guilty to murder in the first degree. Certainly we are not anxious to share the responsibility for such a lamentable situation. We are well assured that the common practice in the district courts of this state is not to accept a plea of guilty in any felony case except on the well-considered advice of counsel for the prisoner; and some careful judges take other precautions to avoid miscarriage of justice which need not now be discussed. One thing is certain, this court has never affirmed a judgment of penal servitude on such a record as here presented. Even the justice of the peace who bound over the defendant swore he did not know for sure whether the lad understood what he was about or not. On the hearing of the motion which raised the question whether defendant had waived a preliminary examination, the justice of the peace testified:

"I asked him [defendant] first, as I remember it, if he knew what he was charged with. He said that he did. . . . I explained to him what he was there for and the purpose of the preliminary examination and asked him whether or not he wished to waive his preliminary examination or whether or not he wished it set down for a definite date for hearing. He, of course, didn't understand that and I went—. . . .

"A. As I remember it, he said that he wanted to plead guilty. A plea of guilty I told him could not be made in justice court—couldn't be accepted— and I told him—the county attorney or myself made the statement that if those were his wishes the only thing he could do would be to waive his pre-

liminary examination, and later on he did waive his preliminary examination. . . .

"A. I went into it very thoroughly because of the gravity of the offense and *because of the fact that the boy was very young*. . . .

"Q. Could you get any reaction from him as to whether he was understanding or paying any attention to what you did say? . . .

"A. Yes, I thought he understood it."

However, this court is not prepared to say that the trial of this defendant could not have gone ahead in the district court on this showing. (*State v. Handrub*, 113 Kan. 12, 213 Pac. 827; *Hancock v. Nye*, 118 Kan. 384, 234 Pac. 945; *State v. Miner*, 120 Kan. 187, 243 Pac. 318.) What this testimony of the justice did develop was the indispensable need of a competent and courageous attorney to give absolute assurance that some responsible person charged with the solemn duty of caring for defendant's interests did understand what was being done in his case.

We have already remarked that the record does not reveal any of the facts of the seven crimes charged against defendant. The *corpus delicti* was taken for granted. The most light we can glean is supplied by a dialogue between the trial court and the defendant:

"By the Court: There are seven counts in the information. As I remember them in a general way, one of them charges the killing of your father and another your mother, and then there are five counts that charge the killing of your five brothers and sisters. You understand there are seven charges made against you in the information? A. Yes.

"By the Court: And you are pleading guilty to all seven of them? A. Yes, sir.

"By the Court: How did you come to do this? A. Well, I—just the way my dad treated me. He didn't care what he did.

"By the Court: I have never seen the original confession I understand you signed, though *I have read in the newspapers about it*. In that confession, as I remember it, the statement was made in substance that you had killed all of these people with one shot each of a target rifle. A. Yes, sir.

"By the Court: That doesn't occur to me as being possible. A. Well, it is.

"By the Court: And especially in view of the fact that I understand you had said you pointed the gun at these members of your family and shut your eyes and pulled the trigger. A. Yes, sir.

"By the Court: Do you know where the bullets—what part of the body the bullets struck each one? A. I think right about the heart.

"By the Court: Right about the heart? A. Yes, sir.

"By the Court: Did any of them try to take the gun away from you, or anything of that kind? A. No.

"By the Court: Did any of them try to get away or run? A. No.

"By the Court: The five children were in the kitchen at the time you started the shooting? A. Yes, sir.

"By the Court: Did you shoot all five of them, one right after the other? A. Yes, sir; I did.

"By the Court: And then your mother? A. Yes, sir.

"By the Court: And then your father? A. Yes, sir.

"By the Court: Did any of the five of your brothers and sisters make any effort to get out through the doors or escape from you, or— A. No, sir; they didn't.

"By the Court: —or to take the gun away from you, or anything of that kind? A. No, sir; they didn't."

The foregoing dialogue prompts one observation, which is, however guilty this defendant may be, the court did not succeed in getting at the truth. No person can put *seven* bullets through the hearts of *seven* persons in *seven* shots *with his eyes shut.*

Other matters urged in appellant's behalf need only brief comment. The conduct of the sheriff in refusing access to the defendant and to unmolested and private consultation with him was peculiarly reprehensible. It was tantamount to oppression in office, of a character which standing alone would have seriously imperiled the success of the state's case; and for which a civil action against the sheriff personally has sometimes been upheld. See notes in 23 A. L. R. 1382 and 54 A. L. R. 1220. The attitude of the county attorney toward the delinquency of the sheriff was not commendable; and the belated judicial relief obtained from the trial court or, more precisely, from the judge, to correct such situation was merely an informal letter saying that he had taken up with the county attorney the motion of counsel and understood the county attorney agreed with him, and that counsel for defendant could make arrangements with the latter to secure what they were entitled to— a convenient and sufficient opportunity to consult privately with their client.

Surely this court cannot be expected to uphold the practices which characterized the proceedings disclosed by this record. We cannot stultify ourselves by writing an opinion to sustain them which will be printed in a book for lawyers and judges to read.

So far as concerns the "commission" appointed by the court or judge to investigate the conduct of the sheriff and county attorney and whether the defendant had made a confession of crime, and if so what or how many crimes, and whether such confession was unconstrained and understandingly made, a majority of this court hold

that such a procedure was grossly erroneous, altogther unknown to and unauthorized by the penal code. We can give it no countenance whatever; and the significance given to its "deliberations" and "report" by counsel for the state only makes it perfectly clear, if that did not otherwise already appear, that the judgment entered in this case was brought about by such a startling departure from correct procedure for the administration of justice that it cannot stand.

In a belated supplemental brief submitted by the state a copy of what purports to be a confession verified by the defendant is set forth. But this confession was never brought into the record. The trial court never saw it; all he knew about it was something he had read about it in the newspapers; consequently it can add nothing to the validity of this judgment. In this brief, also, are citations of cases from other states where pleas of guilty were received without advice of counsel. We have examined them all. In Barnes' Case, 92 Va. 794, the defendant was a woman, but the record does not show what was the nature of her offense. Neither is the nature of the offense disclosed in *State v. Raney*, 63 N. J. L. 363. In *State of Louisiana v. De Serrant*, 33 La. Ann. 979, the offense was grand larceny; in *Baker v. State*, 9 Okla. Cr. 62, the crime was larceny of live stock; in *State v. Moore*, 121 Mo. 514, it was burglary; and in *State v. Terry*, 201 Mo. 697, the plea of guilty was upon a charge of felonious assault. In none of these was the defendant a mere boy, and none of the offenses arose to the gravity of murder. Without approving or condemning the practice of accepting a plea of guilty on miscellaneous charges of crime without advice of counsel, we can see how mature criminals who know quite well what they are about may be permitted to do so; but where the charge is murder in the first degree and the punishment necessarily imprisonment for life, and no possible advantage or leniency to the defendant could be gained by pleading guilty thereto without the advice of counsel, such a plea should only be received with great circumspection. From a seventeen-year-old boy it should not be so received at all.

The state's brief is also concerned with the complications which will arise over the administration of the estates of this defendant's parents if the judgment on his plea of guilty is not permitted to stand—an argument that only strengthens our conviction that other matters than that of due observance of the orderly procedure for the administration of justice in criminal cases were given too much concern throughout this case.

The judgment is reversed and the cause remanded to the district court with instructions to grant defendant's motion to withdraw his plea of guilty and for further proceedings consistent herewith.

HOPKINS, J. (dissenting): I cannot concur in the statement of facts, the argument contained in the opinion nor the conclusion of the majority, and under all the circumstances consider a brief statement of the facts essential to a correct understanding of the question here for decision. The case has been fully presented by both parties through abstracts, briefs and oral argument. Substantially these facts appear:

The evening of April 20, 1928, the home of Will Oberst, a farmer of Butler county, was burned. In the ashes and debris of the burned home were found the charred remains of Will Oberst, his wife, two small daughters and three young sons. The defendant, who was the only surviving member of the family, had on the same evening driven the family car from the home in question, to the homes of two neighbors who joined him and drove to a picture show in Florence. Fifteen days later, May 5, 1928, the county attorney swore to a complaint which he filed with a justice of the peace (examining magistrate) for the city of El Dorado, charging the defendant in separate counts with having murdered the other seven members of his family. On the same day the justice of the peace issued a warrant, based upon the complaint, for the arrest of the defendant, and on the same day the warrant was returned, reciting its execution and custody of the defendant. The justice asked the defendant if he knew with what he was charged. He stated he did. He was asked if the warrant had been read to him. He said it had. The justice explained to him the purpose of the preliminary examination and asked him if he wanted an attorney or anyone at the preliminary examination. He said he did not. Asked whether or not he wished to waive preliminary examination or whether he wished it set down later for definite hearing, he answered he wanted to plead guilty. The justice explained to him that he could not plead guilty in justice court; that if those were his wishes the only thing he could do was to waive the preliminary examination. This he did. May 9, following, the defendant was brought into court, copy of the information furnished him and inquiry made whether he desired the court to appoint an attorney to represent him. He replied that "he did not care." (It may be observed that this was

five days after he had made a sworn confession before the clerk of the court that he had committed the murders.)  The court inquired if he desired to plead guilty or not guilty.  He replied that he plead not guilty.  May 16, he was again brought into court and the following proceedings were had:

The court:

"Q. The officers tell me you want to plead guilty.  Is that true?  A. Yes.

"Q. You have thought this matter over, have you, since you were here the other time and desire to plead guilty?  A. Yes, sir; I have.

"Q. You feel that you fully understand the nature of the charges that are made against you, and all that?  A. Yes, sir.

"Q. What was it that caused you the other day to change your mind when I asked you if you wanted to plead guilty?  A. Well, I didn't hardly understand what you meant.

"Q. I realize that there was a crowd here and all that and that you might have become nervous and excited.  A. Yes.

"Q. Do you want the court to appoint any attorney or anyone to advise with you or anything of that kind?  A. It don't make any difference to me.

"Q. You are guilty of the charges and you want to plead guilty to them? A. Yes, sir.

"Q. There are seven counts in the information.  As I remember them in a general way, one of them charges the killing of your father and another your mother, and then there are five counts that charge the killing of your five brothers and sisters.  You understand there are seven charges made against you in the information?  A. Yes.

"Q. And are you pleading guilty to all seven of them?  A. Yes, sir.

"Q. How did you come to do this?  A. Well, I— just the way my dad treated me.  He didn't care what he did.

"Q. I have never seen the original confession I understand you signed, though I have read in the newspapers about it.  In that confession, as I remember it, the statement was made in substance that you had killed all of these people with one shot each of a target rifle.  A. Yes, sir.

"Q. That doesn't occur to me as being possible.  A. Well, it is."

The written confession to which the court and the defendant both referred was not formally introduced in evidence.  There was no occasion for it to be so introduced, even though the court and defendant took it into consideration.  It was discussed in oral argument before this court and is not denied.  In answer to questions by the court, the defendant detailed quite clearly his acts.  How he loaded the gun; first shot the children and his mother and later his father when he came home.  That he was in his work clothes at the time he killed them.  That he left the five children and his father lying in the kitchen and his mother in the dining room.  That he changed his clothes after the killing and went and got in the

car and left. That he used a pump gun that held sixteen shots; that by moving the chamber a new shell was put into the barrel. That the cartridges were ordinary lead bullets, "22 shorts." There was no substantial variance between his statements to the court and those contained in his signed confession. The signed confession which is before us contains a little more detail in some particulars. For instance, the order in which the murders were committed— first his little brothers, a sister, his mother, the other sister, and then how he laid in wait for his father, who was away from home, and shot him as he was about to enter the house upon his return. That he dragged his father's body into the house, piled it with his brothers and sisters in the kitchen and left his mother's body in the dining room. How he went to the cellar, got coal oil, poured it on the floor, took papers and set the house on fire, got into the car and drove away. The closing questions asked by the court, and answers by the defendant, were:

"Q. Anyway, you are guilty of these crimes as charged against you? A. Yes.

"Q. Do you know of any reason why I should not sentence you on your plea? A. No, I don't.

"Q. A plea of guilty to the charge of first degree murder carries with it a sentence of hard labor at close confinement in the penitentiary. You realize that, do you? A. Yes."

All of these facts and more were before the trial court. The defendant's confession concerning which the court questioned him was executed May 4. Following that the court, as shown by the record, had appointed a commission made up of four practicing lawyers, a banker, who had formerly been a practicing lawyer, and three other prominent citizens, to investigate, confer and report. The commission reported, among other things, that—

"He related to us the same facts that we understood he has made to the officers, talking freely, voluntarily and supplementing the statement from time to time in reply to questions of some of our members. He told us that no force or violence was at any time applied to him by any of the officers, that no resort was had by the officers to any physical means whatever, but that the activity of the officers was limited to the asking of questions and the making of statements, even as was done in the commission's hearing. That the officers had all treated him with kindness and consideration and that he had made statements to the officers for one reason only, and that was because of the truth thereof, and from a feeling that he must tell it to get if off his mind. The commission asked many questions seeking to clear up apparent impossibilities in the statement, but were unable to get

any clearer statement, defendant saying he did not recollect details which seemed important to us but which were not covered in the statement. . . . That he still maintains that the facts as recited in that confession are true."

As suggested in the majority opinion the facts were not developed in court by sworn testimony. True the defendant was not sworn as a witness but he did in open court, of his own free will, detail clearly to the court the commission of one of the most atrocious crimes recorded in the annals of Kansas. The court, as was its bounden duty, sentenced him as the law prescribes. Some eight days thereafter, May 24, counsel representing the defendant filed motions to vacate the judgment and sentence and to remand the case for preliminary examination. These motions were by the court duly and regularly considered. The court had taken extraordinary means to ascertain the facts and safeguard the interests of the defendant, having twice in open court explained to him his rights and interrogated him as to the truth of his guilt, and as stated in the state's abstract, having made a personal investigation and knowing all the facts much better than this court could possibly know them, in the exercise of its sound discretion overruled such motions. In this court counsel contend that the court therein and thereby abused its discretion.

Do the authorities cited sustain the argument and conclusion of the majority? Many of them have no application. For instance, reference is made to section 10 of the bill of rights, which provides:

"In all prosecutions the accused shall be allowed to appear and defend in person or by counsel to demand the nature and cause of the accusation against him."

Of course this is correct. All concede the provisions, but they have no application here. The nature and cause of the accusations against the defendant here were fully explained to him. He appeared and stated substantially that he did not care to defend, that he was guilty of the accusations. Next, R. S. 62-1304 is cited, which provides that where one is charged with a felony if he be without counsel to conduct his defense and unable to employ any, it shall be the duty of the court to assign him counsel at his request. The statute does not apply because it does not appear in any way that the defendant was unable to employ counsel. Nor does it appear in any way that request was made to the court to appoint counsel. The opinion next cites and quotes from *State v. Moore,* 61 Kan. 732, 60 Pac. 748, where it was said:

"A person accused of crime is entitled to the assistance of counsel at every step and state of the prosecution."

Of course he is, when he denies his guilt and is defending. But surely one who reads the Moore case can come to but one conclusion. That case has no application whatever to the facts in the instant case. Moore denied his guilt. He had employed counsel to represent him, one of whom resided in another county, who telegraphed the county attorney inquiring when the Moore case would be heard. That same day he received reply by wire from the county attorney that "the Moore case will be set for trial the 8th." On the 7th, the defendant was brought into court by the sheriff and in the absence of his attorney was required to plead to the information and entered a plea of not guilty. And upon that statement of facts the opinion was written.

It would unduly lengthen this dissent to analyze in detail the various authorities cited and quoted in the majority opinion to show that they do not support the argument or conclusion reached. However, a few brief observations are not out of place. For instance, the case of *City of Salina v. Cooper*, 45 Kan. 12, 25 Pac. 233, has no more application than the *State v. Moore*, supra. The quotation from Heard's Criminal Pleading does not sustain the majority opinion because in the case before us it appeared to the satisfaction of the court that the defendant did rightfully comprehend the effect of his plea. The quotation from Greenleaf is of no more application than that from Heard. The facts in the Czolgosz case are not applicable to the instant case because, as suggested in the majority opinion, of a statutory inhibition in New York against pleas of guilty in first-degree murder cases. And besides there was no showing whatever in the Czolgosz case that full explanation was made to the defendant, nor that he fully understood the effect of an admission of guilt, as in the instant case. On the other hand, there are numerous authorities sustaining the action of the trial court.

For instance, *State v. Thorndson*, 49 N. D. 348, 191 N. W. 628, appears to be a case absolutely in point. There the defendant shot and killed one Dezell, December 28, 1919. The evening of the same day the defendant signed a written confession. The following day he signed a second written confession. In both he admitted shooting Dezell. Both statements were made while the defendant was in custody and before any formal proceedings were instituted against him. On January 13, 1920, a criminal information was filed against

the defendant in the district court, charging him with the crime of murder in the first degree. On the same day he was arraigned, entered a plea of guilty, and was sentenced to life imprisonment in the penitentiary. January 12, 1921, he made a motion for a new trial, asking that the judgment of conviction be vacated and set aside, that he be allowed to withdraw his plea of guilty, and to enter in lieu thereof a plea of not guilty, and that he be granted a jury trial upon the merits. The basis of the motion was that at the time of the killing he was suffering from shell shock, and that he was not responsible mentally and that at the time of entering his plea of guilty he was in no condition, physically or mentally, to understand the nature of his act or the results of his plea, and that he was prevented by the officers from procuring legal advice or having an opportunity to prepare for trial. The court held, in substance:

"The record shows that no undue advantage was taken of the defendant by the officers of the law, or that he was advised or coerced or forced to enter a plea of guilty. No disposition shown on the part of any of the officers to prevent the defendant from procuring the services of an attorney or having a trial if he wished. He was also admonished by the court as to his right, and for this and other reasons stated in the opinion, it is held that the court did not err in denying defendant's motion for a new trial." (*State v. Thorndson*, 49 N. D. 348, headnote.)

In the opinion it was said:

"The defendant in our opinion has failed to establish that in entering his plea of guilty he was deceived or induced to enter it either through fraud or misrepresentation or a misunderstanding of his legal rights. He has failed to establish that his plea was not free and voluntary when entered, and that all the proceedings thereafter, including his conviction and sentence, were not thoroughly understood by him, or that the sentence of conviction is unreasonable or unjust. He has failed to establish that at the time of the commission of the crime his mind was unbalanced, or that he was suffering from shell shock or any nervous disease which prevented his mind from acting openly and understandingly, or that he had not the ability to distinguish between right and wrong..

"This matter, too, was before the district court. The district court had an opportunity of seeing and examining the defendant at the time that he entered his plea, and was thus in a better position to realize the physical and mental condition of the defendant than this court can be from the mere reading of affidavits, and the fact that the district court has denied the petition or motion of the defendant to reopen his case must necessarily carry some weight with this court." (p. 635.)

What is said by the court in the last paragraph of the opinion

just quoted applies in the instant case. The trial court was familiar with all the proceedings had before the justice of the peace; had observed the defendant when in his presence; had consulted with and talked with the officers; had consulted with the members of the commission who investigated the crime; was fully advised of all the peculiarities of the defendant; the facts and circumstances surrounding his home life; his conduct after the fire and crime with which he was charged; his conduct and actions, and the nature of the confession after his arrest, and was fully advised of all the facts and circumstances in the case. The trial court had proceeded with caution and deliberation and being satisfied that the defendant's rights had been protected in every way and that no undue advantage had been taken of him, it pronounced judgment as was its duty. Under all these conditions the court was not guilty of abuse of discretion in denying the motions to remand. In my opinion the court had shown rare discretion for which it is entitled to commendation.

*State v. Layer,* 48 N. Dak. 366, 184 N. W. 666, is summarized in the reporter's headnote, as follows:

"The defendant was arrested and duly charged by a written information filed in the district court of McLean county, N. Dak., with the commission of the crime of murder in the first degree. After his arrest, and before the filing of the information, he made a written confession of guilt, admitting therein that he had killed Jacob Wolff, with whose murder he was charged by the information and further admitting that he also killed Jacob Wolff's five children and Jacob Hofer, the hired chore boy. He states that Mrs. Wolff was killed by the discharge of a certain shot gun when he was endeavoring to take the same away from Jacob Wolff. After the entry of his plea of guilty, the court made and entered a judgment of conviction, and thereafter sentenced defendant to the state penitentiary at Bismark, N. Dak., for the term of his natural life.

"Thereafter defendant made a motion for a new trial and appealed from the judgment of conviction. The basis of the motion was that the written confession was procured from him by duress, coercion, intimidation and fear, and that his plea of guilty was likewise procured, and that neither was voluntary.

"An examination of the record discloses that no duress, coercion, or intimidation was exercised in procuring the confession, nor was such used towards him to procure his plea of guilty to the crime charged in the information, and for these, and other reasons stated in the opinion, it is held that the court did not err in denying defendant's motion for a new trial."

In the opinion it was said:

"If it could be established by competent proof that the defendant had by any means been coerced into entering his plea, or if any means were used to put him in fear, or if by fraud he was deceived, or if for any legal cause his

plea was not free and voluntary when entered, all the proceedings thereafter occurring including his conviction and sentence would be a nullity. There is, however, no such proof." (p. 672.)

In the instant case there is absolutely no question but that the defendant's plea of guilty was openly and freely made without any suggestion of coercion. The defendant was fully informed of the consequences of his pleading guilty. Generally it is a matter of discretion with the trial court to permit a plea of guilty to be withdrawn whether before sentence, after sentence and before judgment, or after judgment. (*People v. Miller*, 114 Cal. 10, 45 Pac. 986; *State v. Stephenson*, 67 W. Va. 553.) In *State v. Hill*, 81 W. Va. 676, 95 S. E. 21, it was held:

"A plea of guilty of a capital crime should be accepted cautiously, and not until the court has warned the prisoner and been satisfied that he has acted freely and deliberately after being so admonished, and with full knowledge, appreciation, and understanding of the nature and consequences of his confession.

"If the facts and circumstances attending the reception and recordation of such plea do not affirmatively appear from the record, it will be presumed that the trial court discharged its full duty in the premises. [See 2 R. C. L. 219.]

"But unless the record shows the fact to be otherwise this court will presume that the trial court discharged its full duty and did not abuse its judicial discretion in denying the prisoner's motion to withdraw his plea of guilty and substitute a plea of not guilty, and pronouncing judgment against him." (Syl. ¶¶ 1, 2, 4; see, also, 2 R. C. L. 219.)

It is not necessary in the instant case to presume the trial court discharged its full duty. The record shows affirmatively that it did. It provided the defendant with more legal protection than the law required. The defendant conferred with four of the leading attorneys of his part of the state, members of a commission whose advice and counsel was provided by the court to confer with him privately; to see that he had not been or would not be denied any legal rights. It is true that none of the above-mentioned attorneys represented the defendant in court at the time he entered his plea of guilty, nor did any attorney, for the reason that the defendant neither made a request for an attorney nor indicated in any way that he desired one.

In *State v. Stevenson*, 67 W. Va. 553, 68 S. E. 286, the court said:

"In order to deprive the court of its discretionary power to refuse leave to withdraw a plea of guilty, it seems to be necessary to show that the prisoner was uninformed or misadvised as to the nature of the charge against him and the effect of his plea, or induced by threats or promises to con-

fess the crime. This mistake, misapprehension, promise, or inducement may relate to the manner and extent of punishment, but it must appear that something of this nature induced the plea." (p. 558.)

The record in the instant case shows affirmatively that there was no mistake, no inducement and no threat to obtain the defendant's plea of guilty.

The constitutional right of the accused to have the assistance of counsel may be waived and a waiver will be implied where the accused, being without counsel, fails to demand that counsel be assigned to him. (*State v. Raney*, 63 N. J. L. 363, 43 Atl. 677.) The first paragraph of the syllabus in the above case reads:

"The right of an accused in a criminal prosecution to have the assistance of counsel in his defense, guaranteed by the last clause of section 8 of article 1 of the constitution, may be waived. When the record and bill of exceptions do not show any request for the assignment of counsel made or refused, but only show that no counsel appeared for the accused, no error is disclosed, for it will be presumed that the accused did not desire the assistance of counsel. Failure to apply for the assignment of counsel indicates a waiver of the right to have the assistance of counsel."

There must be a request for, and a denial of, counsel shown to constitute error. A denial will not be presumed. (*Barnes' Case*, 92 Va. 794, 23 S. E. 784; *State v. DeSerrant*, 33 La. Ann. 979.)

In the Barnes case the court held:

"Every person accused of crime has a right to have counsel to aid him in his defense, but no one is compelled to employ counsel. If the record fails to show whether the accused had counsel or not, or even if it shows that he did not have counsel, it is not ground for reversal unless it further appears that the right to have counsel was denied. It is not to be presumed that the right was denied." (Syl. ¶ 5.)

"The failure of one charged with a felony to request the court to, appoint counsel for him as authorized by Rev. St. 1899, sec. 2560 (Ann. St. 1906, p. 1523) is a waiver of his right to the appointment of counsel to defend him." (*State v. Terry*, 201 Mo. 697, 100 S. W. 432, headnote.)

In the opinion it was said:

"Section 2560, Revised Statutes 1899, provides: 'If any person about to be arraigned upon an indictment for a felony be without counsel to conduct his defense, and be unable to employ any, it shall be the duty of the court to assign him counsel, at his request, not exceeding two, who shall have free access to the prisoner at all reasonable hours.'

"It will be noticed from this statute that three things are necessary to be found by the trial court before appointing or assigning counsel for a defendant charged with felony; first, that the defendant is without counsel; second, that he is unable to employ counsel; third, that the defendant has requested that

counsel be appointed for him. This record does not show that defendant requested the court to appoint counsel for him, but it does disclose that the court found that he was able to employ counsel. Defendant being able to employ counsel, it was not the duty of the court to appoint counsel for him, even though he had requested it. Besides, his failure to make such a request was a waiver of his statutory right. In the case of *State v. De Serrant,* 33 La. Ann. 979, it was held, under a statute which provides that 'every person shall be allowed to make his full defense by counsel learned in the law, and the court before whom he shall be tried shall immediately, on his request, assign to him such counsel as he shall desire' that as it did not appear that any request was made by the accused of the court for the appointment of counsel to defend him, the court was not required to make the appointment. 'If he fails to request the appointment of counsel, he cannot afterwards complain of being unrepresented.' (Wharton's Crim. Pl. and Pr. 9th Ed., sec. 558.)" (See, also, *State v. Moore,* 121 Mo. 514, 26 S. W. 345; *State v. Williams,* [La.] 110 So. 766.)

In *State v. Butchek,* 121 Ore. 141, 253 Pac. 367, it was held:

"In a prosecution for murder, defendant's right to counsel guaranteed by Const., art. 1, sec. 11, held not violated by defendant's failure to obtain counsel, where right to consult with attorney was accorded him in due time, as constitutional guarantee does not require that defendant be represented by counsel." (Syl. ¶ 5.)

In *State v. Yoes,* 67 W. Va. 546, 68 S. E. 181, it was said in the opinion:

"The right to have counsel is a mere privilege guaranteed by the constitution. The provision of the constitution relating to the right of a prisoner to have the assistance of counsel was inserted for the purpose of abrogating the common-law practice under which prisoners accused of felony were denied such right and to restrain the legislature from denying it by statute. It differs in nature as well as form from the guaranty of trial by jury. The latter is prohibitory in form, while the other is permissive, and conditional upon the pleasure of the accused. Preferring the protection of the court or choosing to rely upon his own skill and ability, he may not desire the assistance of counsel. No invasion of this guaranty is disclosed, therefore, unless a request for the assistance of counsel appears by the record to have been denied by the court." (p. 547.)

*Brown v. State* is a recent Oklahoma case, 266 Pac. 491, where the defendant set up the fact, among others, that he was a minor of the age of nineteen years and that he was not mentally capable of entering a plea of guilty. The court held:

"In a criminal action, the defendant has the right to plead guilty, and the effect of such a plea is to authorize a judgment of conviction and imposition of punishment as prescribed by law.

"It is the duty of the court before receiving a plea of guilty to advise the defendant fully as to his rights and the consequences of his plea.

"The record in this case shows that, when the defendant was arraigned for plea, the court advised him of his rights and consequences of his plea." (Headnote, ¶¶ 1, 2, 3.)

It was also held that under statutory provisions the court had the power to modify the judgment and did so, setting aside sentence of death for a term in the penitentiary.

In *Re Meador*, 1 Abb. U. S. 317, Fed. Case No. 9, 375, the court said:

"Take, for instance, the case of a person indicted for a capital or other offense, and who, on arraignment, instead of pleading 'not guilty' to the charge, elects for reasons satisfactory to himself, to plead 'guilty'; if the indictment be sufficient in law the court awards judgment against him; and this is judgment 'by the law of the land' and as lawful under the constitution as if he had been tried and found guilty by the judgment of his peers." (p. 1299.)

In the instant case it is contended, among other things, that the court erred in denying the defendant the right to consult with counsel after his plea and sentence. It appears counsel first appeared May 20 and on May 24 filed a motion to require the sheriff to permit conference with the defendant. The state, in its brief, answers that as soon as the fact was brought to the attention of the court that the sheriff had denied conference, the court advised counsel that they had a right to consult with their client and so advised the sheriff, but that after the court had so advised counsel for the defendant they made no attempt to communicate with defendant until he was brought into court June 9, 1928. Under the circumstances it certainly cannot be seriously contended that there was abuse of discretion on the part of the court.

The majority opinion dwells upon the fact, and I think erroneously, that the *corpus delicti* was not shown. It never has been and is not now the law, at least in this state, that the *corpus delicti* must be proven under a plea of guilty. Complaint was filed against this defendant, warrant was issued and served upon him. He was taken before the magistrate, the charge explained to him and he waived his preliminary examination. An information was drawn and filed, copy delivered to him and read to him and explained to him in every detail. He stated that he understood the accusation against him and desired to, and did, plead guilty. There no longer remained an issue. The allegation of the information that the deceased persons had suffered death at the hands of the defendant and in the manner alleged, was admitted by him. The opinion fails to distinguish the

facts before us from the case where a confession is made but afterwards repudiated and a plea of not guilty entered.

Much stress is laid in the majority opinion on the tender years of the defendant and the trial court is criticized because it appointed the commission to confer with him and report their findings. The court, in my opinion, should be commended for its careful action. Practically it amounted to appointment of four of the leading lawyers of the Butler county bar, in connection with four other prominent citizens of the community, to represent the defendant. The object of trials is to deduce the truth. Any lawyer, if he performs his sworn duty, will bring out the truth and not suppress it. These four lawyers, supported by the four other prominent citizens (whose integrity and high standing is not denied) conferred with the defendant and reported to the court, among other things, that "he still maintains that the facts recited in that confession are true." If the court instead of appointing a so-called commission of eight, had appointed one or two lawyers, who having conferred with the defendant had reported to the court the same as they did report, in what material way would the procedure have been affected or what conceivable benefit would have resulted to the defendant? Technical form should not preclude substance. Would the appointment of a single attorney, or many, as counsel for the defendant have aided him one iota in telling the truth? Time after time he was questioned concerning the offense or offenses and always maintained that he was the one who administered the fatal wounds. Tender years? He lacked only a few months of being eighteen years old. He was a student in high school. On the night of the murders he drove to a town in an adjoining county to attend a picture show. He was not an unsophisticated lad who needed a lawyer to help him tell the truth about what he had done. The court was not only providing the defendant with every legal protection but was taking all means possible to be informed so that there might be no miscarriage of justice. While it is true that none of the lawyers represented him in court at the time he entered his plea of guilty, they did confer with him and he conferred with them. The court could go no further than it had gone. The defendant requested no attorney but stated that he desired to plead guilty. When the court asked him if he desired an attorney he answered that it made

no difference to him and indeed,.under all the circumstances, what difference could it have made to the defendant? He had confessed and pleaded guilty. Of what assistance could any one or all of the lawyers have been to him?

It is argued that the crimes could not have been committed in the way the defendant declared; that it was physically impossible. Perhaps so, but how can that exculpate the defendant? Suppose he did actually murder his little brothers and sisters in a more revolting manner than he disclosed and that that is the reason he endeavored to hide his wanton brutality by burning their bodies. Is that a good reason for holding that the trial court abused its discretion in not setting aside the defendant's plea of guilty? I do not think so.

I am authorized to say that Mr. Chief Justice Johnston and Mr. Justice Marshall join in this dissent.