No. 32,626

THE STATE OF KANSAS, *Appellee,* v. W. D. HAWKINS, *Appellant.*

(51 P. 2d 914)

Opinion filed December 7, 1935.

*J. S. Vernon,* of Larned, and *Walter L. Bullock,* of Dodge City, for the appellant.

*Clarence V. Beck,* attorney general, *Earl B. Swarner,* assistant attorney general, *W. C. Gould* and *Harold Zimmer,* both.of Dodge City, for the appellee.

The opinion of the court was delivered by

BURCH, C. J.: The proceeding was one for a writ of error *coram nobis* to review a judgment of conviction of felony, based on a plea of guilty entered as the result of duress. A demurrer to defendant's evidence was sustained, and he appeals.

On February 10, 1932, defendant was arrested on a warrant issued pursuant to a complaint charging him with having murdered his wife, Mary Hawkins, on February 4, 1932. He waived preliminary examination, and in default of bail was committed to the county jail. On February 11 an information was filed in district court charging him with murder in the first degree. Later in the same day, the following proceedings were had:

"Upon being arraigned on the charge of first-degree murder, the defendant enters his plea of guilty to the crime of second-degree murder, and upon such plea the court finds he is guilty of second-degree murder as charged in the information.

"Thereupon, the defendant is caused to stand before the court and asked if he has any reason why the sentence of the court should not be passed upon him and, he giving no sufficient reason, the court passed sentence in the language as follows:" [Here follows sentence to confinement in the penitentiary at hard labor for life.]

In 1934 defendant filed a motion for a writ of error *coram nobis* supported by affidavits attached to the motion. The motion came on for hearing in February, 1935, before the court, and defendant produced oral testimony. After proceedings had occurred which need not be described, defendant submitted his motion to the court on the pleadings and the evidence, for decision on the merits. The state demurred to defendant's evidence and, as indicated, the demurrer was sustained.

The precedent for a writ of error *coram nobis* is the case of *State v. Calhoun,* 50 Kan. 523, 32 Pac. 38, decided in January, 1893. In the years which have elapsed since that decision was rendered, the remedy has been invoked many times, and each time has been denied. (See *Gibson v. Enright,* 140 Kan. 700, 701, 37 P. 2d 1017.)

The facts in the Calhoun case were these:

"At the February term of the district court of Marion county, in 1885, the grand jury found two indictments against Robert Calhoun for defiling females under the age of 18 years, committed to his care and protection, by carnally knowing them. The fact of such indictments having been found became known in the community. The public mind became greatly excited and hostile to the accused. Threats of lynching him were freely made, and preparations to carry out the same were apparently going on. Knowledge of these threats and preparations was communicated to the accused, who was then in jail, and the same produced in his mind such a state of fear, that, to appease the passions of the community, and secure himself from bodily violence, he pleaded guilty to the charges contained in such indictments, and was sentenced to the maximum limit of punishment—21 years' confinement in the penitentiary at hard labor, in each case." (*State v. Calhoun,* 50 Kan. 523, 528, 32 Pac. 38.)

Evidence of threats made after the pleas of guilty were entered and before the mob completely dispersed, was introduced, showing the temper of the mob and the fact Calhoun's life was in real danger.

The pertinent paragraph of the syllabus of the decision reads:

"Where the accused in a criminal prosecution in the district court is forced through well-grounded fears of mob violence to plead guilty to the criminal charge, and to be sentenced to imprisonment and hard labor in the penitentiary for a term of years, he has a right to relief from such sentence and plea by

an action or proceeding in the same court in the nature of a writ of error *coram nobis.*" (Syl. ¶ 1.)

The significant portion of the foregoing declaration is, "forced through well-grounded fears of mob violence," which meant fears well-grounded in fact.

The following is the substantive portion of defendant's motion:

"That the plea of guilty was made by the defendant unwillingly and involuntarily and under the influence of duress and fears of death caused by the officer in charge after his arrest, who beat and tortured the defendant; threatened to take his life; threatened to arrest his mother and charge her with the crime of murder; informing that he would not be permitted to see an attorney except one appointed by the county attorney of Ford county, and in addition thereto, if he did not enter a plea of guilty, death would be inflicted upon him by a mob that was being formed for that purpose."

There is no statement here that there was in fact any mob. The affidavits attached to the motion did not state there was any mob, and defendant's brief in this court does not undertake to marshal any facts showing there was a mob.

Defendant's brief says there was a considerable number of people frequenting the immediate vicinity of the sheriff's private office during the latter portion of a period in which defendant was held there, and there was considerable talk among these persons. The testimony was there were persons from South Dodge, where defendant lived and where Mary Hawkins met death, in the hall, outside the sheriff's office, talking in groups part of the day; the undersheriff said from 10 o'clock in the forenoon to 12:30 p. m. When the revolting details of the crime became known, some persons said a man who would do that ought to be mobbed, but there was no testimony of anything resembling threats of mob violence, and the undersheriff testified he heard none of the persons threaten to do anything.

The brief says there was considerable talk among officers, and because of facts to be narrated later, he was susceptible to fear of mob violence, brought to him through the suggestion of the officers and the presence of numbers of people from the vicinity of defendant's place of residence. There is an element of truth in this statement, but there was no mob or indication of a mob, and the testimony was defendant offered to tell the truth about the homicide in the early morning, before any crowd of persons assembled in the courthouse.

Defendant's brief contains the following:

"That there was grave danger of a mob being formed, or that a mob was being formed and that this danger of mob violence was, in fact, brought repeatedly to the attention of Hawkins by one or more of the officers grilling him, as well as by the presence of these numerous persons in the hallway adjoining the sheriff's office."

Defendant's chief witness was Edward Gill, a special agent of the Santa Fe Railway Company, who, on request of a superior, acted as a special investigator in the Hawkins case. He, with a number of peace officers, gave Hawkins "the third degree" in the sheriff's private office in the courthouse. The grilling lasted from about 8 o'clock in the evening of February 10, to about noon, February 11. Gill and the officers believed Hawkins was guilty and felt that any means short of physical violence which would bring about a confession was justifiable. Gill testified:

"Q. Did the officers talk about the circumstance of a mob or the danger of one being formed, did they talk about that, about one being formed? A. That was being mentioned. There was some pretty high feeling among people who knew about the case and that there might be possibility of a mob forming.

"Q. Where were these people, if you know? All the people that you just mentioned, that there was a little high feeling? A. We had thought the importance of the crime he was charged with, very notorious killing case, quite a shock to everybody, and when people spoke about it, it was mentioned.

"Q. Now, in the course of your conversation with Hawkins and while you were in his presence, I will ask you whether at any time anything was said by you or others regarding the danger of a mob forming? A. I don't remember saying anything to him directly about a mob forming or a mob; but I have a recollection that there was something mentioned that he better tell us, feeling was pretty high, it would be better for him to tell us something about it. I think we used that as a lever or opening, and he might confess to us."

A motorcycle policemen, Clarence (Speedy) Shipp, was sent by the chief of police to help grill defendant. Shipp's method was big noise and fury. Instead of inducing defendant to tell about the homicide, Shipp repeatedly told defendant defendant murdered his wife. Shipp testified:

"Q. Was there anything said in there while you were there about the danger of a mob? A. He [Hawkins] had that on his mind.

"Q. Did he tell you that? A. Yes, sir.

"Q. Did you hear some conversation about the danger of a mob? A. The only thing I heard while I was in talking to him, somebody came to the door and they told me that I better tone down a little bit, not talk so loud—the undersheriff at that time, Mr. Woolwine—raising hell outside, that they might start having some trouble.

"Q. Now, was it after that incident of this party coming to the door that

Hawkins had the idea in mind about there being some danger of a mob? A. He had spoken of that before.

"Q. He had spoken of that before? A. Yes, sir."

Undersheriff Woolwine denied using the language implied by Shipp's incoherent statement, and testified he told Shipp Shipp was not getting anywhere. The undersheriff also testified he was not apprehensive of danger.

Gill told what occurred:

"Q. You recall of Undersheriff Woolwine coming to the door in that back room the next morning and cautioned the officers about making so much noise? A. I remember Mr. Woolwine making a remark along those lines.

"Q. What did he say, if you recall? A. Well, there was some noise going on in the back office when Mr. Shipp, I think, was questioning Hawkins, and Mr. Woolwine thought he was a little noisy or something like that. He said there, 'Whatever is going on here, there isn't going to be any more of this violence.'"

However, taking Shipp's statement as that of one person concerning what another person said, there was no witness who saw people in the courthouse who gave any testimony descriptive of their conduct or demeanor which would indicate existence of a mob, or an emotional state which might culminate in formation of a mob.

Gill testified as follows:

"Q. How many people were there out here in the hall, if you know? A. I would say there wasn't, not less than thirty-five people, not more than fifty at one time.

"Q. What were they doing? A. Just going up and down the stairways, being curious about what was going on, whether Hawkins had confessed; asking the officers about the progress of the investigation and so on like that.

"Q. Talking among themselves? A. Well, I guess they were. I suppose they were.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. When did he confess, what time did he? A. I think it must have been about between eleven-thirty and twelve-thirty.

"Q. Was this crowd around here at that time? A. I wouldn't want to say, although there was a crowd around here.

"Q. Around through the building? A. Around through the building; yes, sir.

"Q. Did they disperse shortly after that? A. After that was over everybody went home."

No stronger evidence was introduced in support of defendant's motion than that which has been referred to, and the court was obliged to find that, whatever the state of defendant's mind and whatever produced his state of mind, there was no proof of existence

in fact of a mob, either assembled or assembling, with either design or disposition to take defendant from custody of the officers of the law and do violence to him. The result is, defendant was not forced to plead guilty through any fear, well-grounded in fact, of mob violence, and the Calhoun case does not afford a precedent for allowance of a writ of error *coram nobis* in this case.

There was no testimony to sustain the statement in defendant's motion that defendant feared death at the hands of the officer in charge of him, who beat him and threatened to take his life.

The officers acted in relays in trying to break defendant's will and make him confess. They would go into huddles to plan the next method to be used. They bullied and they cajoled in appropriately harsh and dulcet tones. They pounded the table with their fists, and they paraded their guns and clubs, but not in a menacing manner, and no violence was used, except that defendant would be shaken violently when he was about to go to sleep, or was shamming sleep.

In the course of the session of the officers with defendant, defendant told them he, his wife and his mother were the sole occupants of his home, in which his wife was killed. The crime was of a revolting character. Gill testified that in such cases the practice was to examine all persons who might be able to give information, and testified further, as follows:

"Well, several times during the night, when we were questioning him about the details of the conditions around the house at the time this killing or accident happened or took place, we suggested that there was only one other person we could get to break him up, that would be his mother, and we asked him—didn't intend for us to go down and bring his old mother up to the courthouse and question her like the way we questioned him. In fact, I think I said that to him myself.

"Q. Did that occur more than once during the night? A. I presume it did, once or twice or three times."

Defendant contends this was great torture to him while he was grieving over the death of his wife. She was killed by blows on the head with a claw hammer.

For a while defendant denied he killed his wife. Afterward he said, "Well, I will tell you the straight of this if you will let me see my attorney." This statement was repeated several times, but he was not permitted to see his attorney, whom he named, because the officers knew that if an attorney were brought in, their efforts to obtain a confession would be fruitless. As indicated, about noon on February 11, defendant confessed. Papers were completed at

about 3 o'clock in the afternoon, and later in the afternoon, the undersheriff said about 6 o'clock, defendant entered his plea of guilty. The reason for defendant pleading guilty to murder in the second degree, instead of murder in the first degree, is not disclosed. The undersheriff's recollection was that an officer took defendant to see his mother. At 8 o'clock in the evening defendant was placed aboard a train and commenced his journey to the penitentiary. There was no mob at the courthouse and no mob at the train, and defendant requested that he be not taken away until the next day.

Defendant complains because he was not permitted to see an attorney. He did not ask permission of the court to see an attorney. That he was not represented in court by an attorney was a fact perfectly apparent to the court, and consequently the fact was not ground for a writ of error *coram nobis*. (*Asbell v. The State,* 62 Kan. 209, syl. ¶ 1, 61 Pac. 690; *Collins v. The State,* 66 Kan. 201, 71 Pac. 251.) In the opinion in the Collins case the court said:

"That writ lies only to correct the record of the trial itself in matters of fact existing at the time of the pronouncement of the judgment, in respect of which the court was unadvised, but had it been advised, the judgment would not have been pronounced." (p. 202.)

Defendant cites the case of *State v. Oberst,* 127 Kan. 412, 273 Pac. 490. In that case various motions were promptly filed in the district court to undo proceedings wherein defendant, a minor seventeen years of age, entered pleas of guilty to seven felonies, without having been permitted to consult counsel.

In view of the foregoing, defendant's case reduces to this: Defendant was given the third degree, confessed commission of the crime charged against him, and about six hours later, pleaded guilty. Despicable as administration of "the third degree" may be, the evidence in this case wholly failed to establish facts warranting review of the judgment on writ of error *coram nobis*.

The judgment of the district court is affirmed.